# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JGR, INC., | ) | CASE NO. 1:96CV1780 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| THOMASVILLE FURNITURE | ) | **MEMORANDUM OPINION** |
| INDUSTRIES, INC., | ) | **AND ORDER** |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

On September 30, 2010, the Court issued a Memorandum Opinion and Order (Doc. No. 256) ruling on defendant's motion for summary judgment. On September 21, 2011, ruling on defendant's motion for reconsideration, the Court issued a second Memorandum Opinion and Order (Doc. No. 267) clarifying the first order. The Court is now engaged in pretrial preparation, including examination of motions in limine. This preparation has clarified the Court's analysis of the case and requires that previous rulings be revisited. As a result, as discussed herein, Doc. Nos. 256 and 267 are **VACATED** and replaced entirely by this Memorandum Opinion and Order.

## I. INTRODUCTION

Before the Court is the motion for summary judgment (Doc. No. 239) of defendant Thomasville Furniture, Inc. ("Thomasville"). Plaintiff JGR, Inc. ("JGR") filed its brief in opposition (Doc. No. 240) and Thomasville filed a reply (Doc. No. 241). With leave, JGR filed a sur-reply (Doc. No. 245) and Thomasville filed an additional reply (Doc. No. 246). After the undersigned received this case from the docket of Judge Ann Aldrich, the parties, at the

Court's request, filed a Joint Statement (Doc. No. 254), which has also been considered, along with the various opinions from three appeals. For the reasons discussed below, the motion for summary judgment is denied.

## II. BACKGROUND

### A.    Factual Background [1]

JGR is a furniture retailer and Thomasville is a furniture distributor. Gerald Yosowitz was the president of JGR and principal shareholder in JGR. (Compl. ¶ 4.) Prior to establishing JGR, Yosowitz worked at Furniture Land, in Mentor, Ohio, later known as "Baker's," and was its president from about 1978 to 1988. Wanting to open his own furniture business, he resigned from Furniture Land in February 1988, giving four months notice. (2002 Trial, Tr. at 55-56, Doc. No. 75.)[2] As he began to make plans for his own store, he became aware that Mike Baker, one of Furniture Land's owners, planned to do what he could to make sure Yosowitz did not succeed. Yosowitz testified that Baker told him to come back to work for Furniture Land or to get out of the furniture business altogether. (*Id*. at 58.) However, Yosowitz was determined to carry out his plan for his own business. (*Id*. at 62.) He leased a building at the Great Lakes Mall, across the street from a Furniture Land store. (*Id*.) His long range plan was to open four stores. He formed JGR in January of 1990 with three other partners, all of whom had worked for Furniture Land at one time. (*Id*. at 62-64.)

_____

[1] Since the undersigned has not been involved in this case from its onset, the factual background has been reconstructed, as best as possible, from a combination of the complaint and the various opinions/orders of both the district court and the court of appeals, merely for the purpose of context. It is not meant to be definitive with respect to any particular detail in the full record, which spans a period from 1996 until today. In other words, the parties should not perceive this recitation of the factual context of this case as in any way constituting factual findings that will control future proceedings.

[2] Unless otherwise indicated, all references to the docket are to the docket of the instant case, identified generally herein as "Case 2."

In April 1990, while at a furniture market in North Carolina looking for furniture manufacturers to do business with, Yosowitz learned that negotiations between Thomasville and Furniture Land had broken off. Since he had recently lost a deal with another manufacturer, he approached Thomasville to inquire about becoming a Thomasville Gallery, but informed Thomasville that JGR would enter into a contract only on the condition that Thomasville would not contract with Furniture Land. (*Id.* at 67, 71.) Thomasville gave JGR oral assurances. In order to further induce JGR to become a Thomasville vendor, Thomasville also allegedly orally agreed to assist JGR in obtaining lines of credit for purposes of opening a total of four stores over the next year and a half. (Compl. ¶¶ 6, 7.)

On May 6, 1990, JGR and Thomasville entered into a contract ("1990 Gallery Agreement") (Compl. ¶ 8), which stipulated that JGR would dedicate approximately 6000 square feet of its showroom to displays of Thomasville furniture (*id*. ¶ 7). However, this contract made no mention of Thomasville's promise not to do business with Furniture Land. *Thomasville Furn. Indus., Inc. v. JGR, Inc.*, 3 Fed. Appx. 467, 469 (6th Cir. 2001). The contract further stated that JGR had a "non-exclusive right to use the trademarks of 'Thomasville' and 'Thomasville Gallery' . . . [and the] designation may be withdrawn by Thomasville or [JGR] at any time." *Id.* at 469-70 (quoting the 1990 Gallery Agreement). On September 15, 1990, JGR opened its first store at Great Lakes Mall in Mentor, Ohio.[3] (Compl. ¶ 9.)

In February 1991, JGR learned that Thomasville was again negotiating with Furniture Land. (Compl. ¶ 10.) "[JGR] reminded [Thomasville] of [its] oral assurance not to sell to Furniture Land or Baker's. [Thomasville] responded that they were 'just talking' with

---

[3] The store was actually called "Gerald's Furniture Showcase;" however, for convenience, it will be referred to herein as "JGR."

Furniture Land, and for the next year did not give [JGR] a definite answer on whether [Thomasville] would ultimately sell to Furniture Land. [JGR] was convinced that if Furniture Land began to sell Thomasville products, Furniture Land would undercut [JGR] and drive [it] out of business. [JGR] considered dropping the Thomasville line, but decided that [it] had become so associated with the brand that switching product lines would be financially disastrous. Nevertheless, because [JGR's] employees were aware of the uncertainty, they began to steer customers away from Thomasville products, and sales dropped." *Thomasville Furn. Indus.*, 3 Fed. Appx. at 470.

In April 1992, Thomasville advised JGR that it was amending its Gallery Agreement and that, in order to remain a Thomasville Gallery dealer, JGR would have to increase the size of its gallery to 7,500 square feet. (Compl. ¶ 11.) The agreement was again non-exclusive (Compl., Exh. C at 3) and was intended to supersede the 1990 Gallery Agreement. Yosowitz conditioned JGR's acceptance of the terms of the 1992 Gallery Agreement on the requirement that all other retailers in JGR's market would be held to the same square footage requirement. *Thomasville Furn. Indus.*, 3 Fed. Appx. at 470.

On November 15, 1992, Thomasville began doing business with Furniture Land under terms that were more favorable than those offered to JGR (Compl. ¶ 13), specifically, it "would not be required to meet [Thomasville's] gallery space requirements." *Thomasville Furn. Indus.,* 3 Fed. Appx. at 470. Shortly thereafter, Furniture Land, renamed as "Baker's," opened up across the street from JGR and began selling Thomasville furniture. *Id*. at 471.

On November 16, 1992, Thomasville informed JGR that it would no longer ship Thomasville products to JGR without pre-payment. (Compl. ¶ 14.) JGR subsequently closed on

4

October 4, 1993, at which point it owed Thomasville over $500,000 for its furniture inventory. *Thomasville Furn. Indus.*, 3 Fed. Appx. at 471.

JGR claims that, as a result of Thomasville breaching the terms of the contract, JGR began to lose business and, because Baker's was not required to maintain 7,500 square feet of floor space for Thomasville furniture, it was able to lower its prices and beat any price that JGR was offering. JGR alleges that Baker's sent customers over to JGR with instructions to shop there, find the Thomasville furniture they liked, and then return to Baker's to make the purchase at a price lower than that quoted by JGR.[4] Further, JGR alleges that, because Thomasville allowed Baker's to operate without the minimum space requirement, Thomasville only then decided to stop shipping furniture to JGR without pre-payment. Accordingly, JGR claimed that Thomasville's breach of contract led to JGR's demise.

**B.      Procedural History**

On July 1, 1996, Thomasville filed a federal lawsuit against JGR invoking diversity jurisdiction. (Case No. 1:96CV1424, hereafter "Case 1.") The case was assigned to the docket of Judge Ann Aldrich. Thomasville alleged an action on account, namely, that JGR owed it $664,636.24 for furniture delivered between December 14, 1990 and September 1, 1993, and a breach of contract claim seeking the same amount in damages.

On July 23, 1996, JGR filed a state court action against Thomasville alleging two claims: (1) breach of contract, and (2) fraudulent misrepresentation. Thomasville removed the case pursuant to 28 U.S.C. § 1446. It was assigned to the docket of Judge Donald Nugent and was later transferred to Judge Aldrich on the basis of relatedness. (Case No. 1:96CV1780,

---

[4] There was testimony to that effect at both previous trials. (*See* Doc. No. 75 (first trial), at 109-12; Doc. No.  189 (second trial), at 100-103.)

hereafter "Case 2.") The cases were apparently consolidated, although neither docket reflects any formal consolidation order.[5]

Thomasville filed a motion for summary judgment on the issues in both cases, arguing that JGR's claims in Case 2 were barred by the statute of frauds because they were based on an alleged oral contract and that Thomasville was entitled to summary judgment with respect to its action on account in Case 1. JGR, in opposition, asserted that its claim was not grounded solely on the breach of an oral promise but also on a breach of the implied covenant of good faith and fair dealing arising out of the parties' contractual relationship and that such a violation was outside the reach of the statute of frauds.

The summary judgment motion was granted in its entirety by Judge Aldrich on September 7, 1999; the Court dismissed JGR's claims against Thomasville in Case 2 on statute of fraud grounds and entered a stipulated judgment, ordering JGR to pay Thomasville $869,829.94 in damages in Case 1 (consisting of $536,931.94 for goods sold plus interest at the rate of 10% from July 15, 1993 to October 1, 1999 in the amount of $332,898.00). (*See* Doc. No. 36; *see also* Case 1, Doc. No. 65.) The latter judgment was memorialized on the docket of Case 1 on November 15, 1999 when the Court denied JGR's motion for reconsideration of the summary judgment ruling; it was officially entered as a final judgment on December 20, 1999. (*See*, Case 1, Doc. Nos. 61 and 64.)

On February 7, 2001, the Court of Appeals reversed the summary judgment order and remanded for further consideration of "the question of the scope of the written terms of the 1992 Agreement[.]" *Thomasville Furniture Industries, Inc. v. JGR, Inc.*, 3 Fed. Appx. 467, 475

---

[5] Case 1 is actually closed and is not assigned to the docket of the undersigned judge. However, because it was consolidated with Case 2 (the instant case), its procedural background is relevant to the discussion.

(6th Cir. 2001) (hereafter, "first appeal"). The Court of Appeals found that JGR's claim was not based solely on an oral promise and that there was a question of fact as to whether a 1992 letter from Thomasville giving assurances that all of its galleries would be held to the same square footage requirements was part of the 1992 Gallery Agreement.[6] If it was, Ohio law would allow JGR to pursue a cause of action for breach of an "implied covenant of good faith and fair dealing based on the terms of an existing written contract." *Id*. at 471.[7]

On remand, the jury found that the 1992 letter was part of the 1992 Gallery Agreement and that Thomasville breached that contract. The jury awarded JGR $0 for lost profits and $1,500,000 for loss of business value. (Doc. No. 50.) Thomasville appealed the judgment claiming that there was no basis for loss of business value damages and JGR cross-appealed the denial of its motion for pre-judgment interest. *See JGR, Inc. v. Thomasville Furniture Industries, Inc.*, 370 F.3d 519 (6th Cir. 2004) (hereafter, "second appeal"). The Court of Appeals held that the damages witness for JGR, James Gornik,[8] testified as a lay, not expert, witness. It concluded that it was an abuse of discretion for the district court to have permitted Gornik to offer lay opinion testimony on JGR's lost profits and loss of business value because, not being an officer or director of JGR, he had no first hand knowledge of the company's

---

[6] A copy of the 1992 Letter is attached to Thomasville's motion. (Doc. No. 232-2 at 3-5.)

[7] This is one place in the record where the purported consolidation of Case 1 and Case 2 causes some confusion. Appeals were filed in both cases and those appeals were consolidated. When the Sixth Circuit vacated the summary judgment on February 7, 2001, it did so in an opinion that never really addressed the damages awarded for Thomasville's action on account (Case 1). The parties do not now question the viability of the November 15, 1999 damages judgment of $869,829.94 against JGR on Thomasville's claim in that case or that it will serve as a setoff against any judgment that JGR may obtain against Thomasville in Case 2. In fact, this Court, at Thomasville's request and without objection from JGR, entered an order in Case 2 reviving the November 15, 1999 damages judgment, *see* Case 2, Doc. No. 255, with there being only a question as to the current amount of the judgment. *Id.*, n. 2.

[8] Gornik was a CPA and lawyer who was hired by JGR in March 1999 to "put[ ] down on paper what the financial statements of Gerald's Furniture would have looked like had the Thomasville support to the business continued and had the owners been able to carry through on how they planned to operate the business." 370 F.3d at 524 and n.3.

finances and had based his opinions on information which had been supplied to him by Yosowitz but which he had not independently verified. *Id.* at 526. The Court of Appeals affirmed the judgment "insofar as it reflects the jury's verdict as to liability," 370 F.3d at 527, but vacated the jury's damages award and remanded "for a new trial solely on the issue of damages." *Id.*

In 2006, the case was retried "solely on the issue of damages," and a jury awarded JGR $3.3 million for lost profits and $3.53 million for lost opportunity costs. (Doc. No. 190.) Thomasville appealed, asserting, *inter alia*, that it was error for the district court to have permitted JGR to seek lost profits when it had failed to challenge the prior jury's award of zero lost profits. JGR cross-appealed, asking the court to review the district court's refusal to add to the judgment an amount equal to the interest JGR owed Thomasville on the 1999 judgment in Case 1. *See JGR, Inc. v. Thomasville Furniture Industries, Inc.*, 550 F.3d 529 (6th Cir. 2004) (hereafter, "third appeal"). The Sixth Circuit held that JGR could not seek lost profit damages because it had not appealed the $0 award from the 2002 trial. The court vacated the district court's judgment and remanded "for a new trial for loss of business value damages." *Id.* at 531.[9]

---

[9] The Court notes that the jury verdict which was the subject of the third appeal was for $3,300,000 in "lost profit damages" plus $3,530,000 in "opportunity cost damages." Judging from the jury instructions for that trial, "opportunity cost damages" were damages relating to "profits lost from a second furniture store that never opened[.]" (Trans., Doc. No. 202, at 84.) Judge Aldrich denied JGR's attempt to recover for losses relating to planned third and fourth stores because that would have been too speculative, in light of Thomasville's right to terminate the contract at any time. (*See* Doc. No. 148, at 6.) Thomasville had opposed allowing the jury to consider any evidence of "opportunity cost damages" because, in Thomasville's view, such damages should be awarded in the form of prejudgment interest, if any, which is a matter for the court, not the jury, to decide. It appears that the verdict form listed the two kinds of damages separately so that Judge Aldrich would not have to determine pretrial whether or not to grant prejudgment interest. (*See* Trans., Doc. No. 186, at 24.) In fact, Judge Aldrich later decided that prejudgment interest was warranted but, because the amount she awarded was less than the "opportunity cost damages" and because prejudgment interest and damages for lost opportunities served the same purpose, she set off the amount awarded against the jury verdict.

On appeal, because JGR had previously waived its right to relitigate "lost profits," by virtue of its failure during the second appeal to challenge the 2002 verdict awarding $0 of lost profits, and because the "lost opportunity costs" award was entirely dependent on this improper *new* award of lost profits, the Sixth Circuit vacated the entire 2006 jury verdict and remanded "for a new trial for loss of business value damages." 550 F.3d at 531.

In the Joint Statement filed by the parties at this Court's request (in response to several questions the Court had when it received this case from the docket of Judge Aldrich), JGR asserts that, on retrial, it should be allowed to pursue not only the "loss of business value," but also its "lost opportunity costs," which JGR now defines as

The Court of Appeals expressly declined to rule on "Thomasville's other arguments [and] on JGR's request for damages in the amount of interest on Thomasville's 1999 judgment against it." *Id.* at 531, n.1.

On remand, Thomasville filed a motion for summary judgment on the grounds that the loss of business value for JGR is zero, making JGR entitled to no more than nominal damages.

### III. STANDARD OF REVIEW

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> **(1)** ***In General.*** A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.
>
> **(2)** ***Opposing Party's Obligation to Respond.*** When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

---

consequential damages representing "the money that JGR's expert opines would have been realized by JGR as a return on invested funds." (Doc. No. 254, p. 2, ¶ 3.) Thomasville still asserts that any issue of "lost opportunity costs" should be addressed under Ohio's prejudgment interest statute, provided JGR can first establish causation.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

## IV. DISCUSSION

In this case, there is a very extensive record, including a fair amount of sworn trial testimony. As a result of all of the proceedings to date, several matters have been decided (some

by way of jury trials; others by court decisions): (1) a judgment in Thomasville's favor in Case 1 in the amount of $869,829.94 in damages ($536,931.94 for goods sold, plus interest at the rate of 10% from July 15, 1993 to October 1, 1999[10] in the amount of $332,898.00);[11] (2) Thomasville's liability for breach of contract (i.e., breach of the so-called 1992 Gallery Agreement) in Case 2; (3) that JGR was awarded zero lost profits as a result of this breach, failed to appeal that judgment, and has now waived any right to recover damages for lost profits; and (4) that any damages which JGR may recover at the current stage of the proceedings will be set off by the amount that it owes Thomasville in Case 1.

The questions now remaining for determination in Case 2 are the amount of damages, if any, to which JGR is entitled for the "loss of business value" and whether JGR is also entitled to recover "return on investment" damages, also referred to as "lost opportunity costs."

---

[10] It is not clear to the Court why this date range was chosen; however, since there is no dispute regarding the *fact* of this judgment, the Court will simply accept the validity of the date range and assume it was chosen for good reason.

[11] The impact of this judgment on any judgment in Case 2 is, at least partially, in dispute. In the Joint Statement (Doc. No. 254), JGR asserts that an element of its consequential damages which should be considered at the retrial in Case 2 involves the prejudgment and post-judgment interest associated with the November 15, 1999 judgment against it in Case 1. JGR asserts that "had there been no breach of contract by Thomasville, JGR would not have had to pay any of this prejudgment or post-judgment interest because JGR would have continued in business and been able to pay off its indebtedness to Thomasville without having been sued." (Doc. No. 254, pp. 3-4, ¶ 3.) JGR wants to recover as damages from Thomasville an amount equal to the amount of interest that JGR will owe Thomasville on the November 15, 1999 judgment. This was an issue raised by JGR in the third appeal, but the Sixth Circuit declined to rule on it. 550 F.3d at 533, n.1.
    Thomasville takes the position that this is not a matter for the jury and that it is JGR's "attempt at double recovery because JGR seeks a 10% compounded return on the funds that it now claims it would have used to pay off its debt to Thomasville." (Doc. No. 254, p. 4, ¶ 3.) Thomasville also asserts that Judge Aldrich already decided this issue against JGR on January 26, 2007. (*See* Case 2, Doc. No. 208, at 8-9) (concluding that JGR was not entitled to $713,000 in damages to offset the interest owed on the judgment in Case 1 because it had never sought such damages and did not plead them in its complaint).
    What is not in dispute with respect to this judgment is that, whatever its value, that amount should be set off against any damages JGR be awarded in Case 2.

A.      **The Parties' Arguments**

In its motion for summary judgment, Thomasville argues that, by law, JGR suffered no loss of business value because, according to JGR's own audited financial statements presented at the 2006 trial, for the three years prior to the breach in 1992, JGR was operating at a loss, i.e., with no profits. Therefore, according to Thomasville, at the time of the breach JGR's business had no value as a going concern and, therefore, JGR is not entitled to any damages as a result of the breach. Thomasville also argues that, even if JGR were able to establish that it had some value at the time of the breach, it cannot show that Thomasville's breach *caused* a loss of business value, i.e., caused damages. It asserts that whatever harm JGR suffered as a result of competition with Furniture Land/Baker's was not the result of Thomasville's breach of contract.

In opposition, JGR argues that valuing a business destroyed by another's actions can be done in several ways, but that the usual method of valuing a business is to project future earnings over a reasonable time period and then discount the projected future earnings or cash flow back to the date of valuation, using a rate of return multiplier. (Opposition, at 4.) JGR also asserts that Ohio courts (and others) have often held that calculation of loss of business value can properly ignore a history of losses[12] and be predicated instead on the owner's future plans. Finally, as to the issue of causation, JGR argues that previous juries have already concluded that JGR's injuries were caused by Thomasville's breach of contract.

In reply, Thomasville does not really address JGR's arguments but, instead, argues that no willing buyer in the open market would have purchased JGR's business for any

---

[12] JGR is of the view that its actual performance in 1991 and 1992 was not an accurate barometer of how well it would have performed after November 1992 had there been no breach. This is because JGR's business began to falter after February 1991 (five months after it opened), when it confirmed that Thomasville had resumed negotiations with Furniture Land. The uncertainty caused by this state of affairs was devastating, according to Yosowitz.

sum on November 14, 1992, the day before the breach, because the business was "worthless, for reasons having nothing to do with the adjudicated breach of a 'non-material' term of the contract at issue." (Reply, Doc. No. 241, at 1.) This is an argument based on the concept of "fair market value." Thomasville further argues that, to avoid summary disposition, JGR must present evidence that a reasonable jury could conclude entitles it to greater than $1,672,695 in damages-- the alleged current value of Thomasville's November 15, 1999 judgment against JGR, which must be set off against any award to JGR. Thomasville asserts that, correcting for two of three "clear legal errors" made by JGR's current damages expert (Robert Greenwald), JGR cannot meet this burden. The first "legal error" is an attempt to recover damages for four stores, when Judge Aldrich had already ruled that damages for the third and fourth stores would be purely speculative. The second "legal error" is an attempt to recover for pre-breach interference damages. The third "legal error" is an attempt to recover "return on investment" damages which have not previously been pled and which were not included in the mandate of the Sixth Circuit on remand.

In its sur-reply, JGR objects to Thomasville's abandonment of its initial arguments in its summary judgment motion and its substitution of new arguments regarding three clear legal errors. JGR asserts that (1) the number of stores to be included for purposes of valuation of the business is a matter for a jury to decide because Judge Aldrich's ruling involved only a motion in limine;[13] (2) Mr. Greenwald's calculations do not include any damages caused by pre-breach conduct; and (3) JGR is not precluded from recovering "return on investment" damages. JGR also argues that Thomasville has miscalculated the value of its November 15,

---

[13] JGR asserts that Yosowitz should be allowed to testify as to his plans to open four stores, a plan which Thomasville had approved. This testimony would constitute evidence that the third and fourth stores were "within the contemplation of the parties at the time of the time [sic] of the contract was made[.]" (Sur-reply, Doc. No. 245, at 7.)

1999 judgment against JGR (a) by using state, instead of federal, post-judgment interest rates; (b) by relying on its own, rather than JGR's, expert's calculations; and (c) by failing to account for JGR's claim for reimbursement of the interest components of that judgment, components which JGR asserts it never would have owed had there not been a breach of contract by Thomasville.[14]

Finally, in further reply, Thomasville insists that this Court must decide these "legal issues" before this case goes once again to a jury. It concedes that it should have used federal post-judgment interest rates, but argues that it makes no difference to the outcome of its argument because, even using those rates, JGR's damages are still lower than the judgment against JGR on Case 1. It reasserts the arguments made in its reply brief[15] and adheres to its belief that there is no live case or controversy for a jury to decide.

## B.    Analysis

This Court is of the view that there are too many factual disputes for it to award summary judgment. Even though there is a sizeable record, including trial transcripts,[16] it is not this Court's role to comb through that record in order to make fact calls. Any factual evidence

---

[14] JGR's argument is that, had Thomasville not breached the contract, JGR would have remained in business and would have eventually paid off its account to Thomasville without need of litigation and without any service charges, which, according to trial testimony, were typically waived by Thomasville when a customer paid off past due balances. Thomasville takes the position that Judge Aldrich already ruled that JGR was not entitled to consequential damages equal to the amount of interest it would have to pay on the November 1999 judgment because it had not included such damages in its proposed jury instructions and never sought such damages. JGR points to the record to refute this conclusion. *See* Doc. No. 182, Proposed Revised Requested Jury Instruction No. 1. JGR appealed Judge Aldrich's refusal, on its Rule 59(e) motion, to amend the judgment to include $713,000 in interest costs, but the Sixth Circuit declined to address the issue. 550 F.3d at 533, n.1.

[15] In particular, it challenges any attempt by JGR to seek damages for "return on invested funds," arguing that this is a new element of damages and, if permitted, will further delay the trial because of the need for additional discovery. JGR's expert, Mr. Greenwald, has stated that "significant portions of cash flow would not be reinvested into the business," which Thomasville interprets as "meaning that most of the money would have been distributed to the JGR partners to invest as they please." (Reply, Doc. No. 246, at 11.) As a result, Thomasville argues, permitting this new form of damages would change the central focus of the trial from breach of contract to "the extent of the JGR owners' investment acumen." (*Id.*).

[16] Interestingly, the Court notes that there are no trial exhibits in the record although, clearly there were exhibits admitted at the two trials which were already conducted.

14

that has been submitted to earlier juries must be resubmitted to a new jury. At this juncture, the Court's role is to decide the legal issues that remain in dispute, including any questions relating to the "law of the case." Therefore this opinion will set forth the law that the Court will apply when this case, once again, goes to trial on the issue of damages.

## C.     Law Applicable to a Determination of JGR's Damages in this Case

### 1.     Whether Causation Has Been Established

The simplest contested legal issue to decide is whether JGR has already established the necessary causation in order to recover damages.

There have been two jury trials in this case. The first trial resulted in a jury verdict in JGR's favor amounting to $0 in lost profits and $1.5 million for loss of business value. That verdict was overturned because the trial court allowed improper lay witness testimony regarding the amount of damages; however, the Sixth Circuit let stand the verdict of Thomasville's liability to JGR for breach of the 1992 Gallery Agreement, which included the 1992 Letter.

The second trial, on damages only, resulted in a jury verdict of $3.3 million in lost profits and $3.53 million in lost opportunity costs. The Sixth Circuit overturned that damages verdict because JGR should not have been permitted to pursue lost profits when it had failed to appeal the original jury's award of $0 in lost profits. The other aspect of damages was overturned because it was too closely dependent upon the improper lost profits verdict.

In *both* trials, Judge Aldrich properly instructed the jury that damages awarded, if any, had to be "proximately caused by Thomasville's breach of contract." (*See* Transcript of first trial, Doc. No. 78, at 612; Transcript of second trial, Doc. No. 202, at 82.) *See V&M Star v. Centimark Corp.*, No. 4:07CV3573, 2009 WL 5943241, at *9 (N.D. Ohio Feb. 4, 2009) ("[t]o recover on a breach-of-contract claim, the claimant must prove not only that the contract was

15

breached, but *that the claimant was **thereby** damaged*") (emphasis in original) (citing *Munoz v. Flower Hosp.*, 30 Ohio App.3d 162, 168 (Ohio App. 6 1985) and *London v. Ohio Northern Univ.*, 68 Ohio App. 3d 190, 195-96 (Ohio App. 3 1990)). Because both juries awarded damages (although the awards were later overturned), this Court must assume that each jury followed the court's instructions to award only those damages which were proximately caused by Thomasville's breach of contract. *See U.S. v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001) ("juries are presumed to understand and follow directions from the court").

The Sixth Circuit never questioned the issue of causation and, in fact, that issue was never raised in the course of either of the appeals from the two jury verdicts. Therefore, this Court concludes that, since juries found causation by virtue of the damages awards and since the Sixth Circuit did not overturn the verdicts on any basis relating to causation, causation has been definitively established and need not be re-established at the next trial on damages.

That said, it goes without saying that, in order for JGR to recover damages, it will have to show that whatever losses it can establish actually were caused by the breach of contract. That is mandated by the law of damages. JGR will be given that opportunity at trial. Thomasville will be given an equal opportunity to argue that any losses were not caused by its breach.

### 2.    What Elements Go Into Valuing a Business for Purpose of Computing Loss of Business Value Damages

Thomasville asserts that, under Ohio law, loss of business value is calculated by measuring the difference between the value of the business before the breach and the value of the business after the breach. *See Taylor v. B. Heller & Co.*, 364 F.2d 608, 612 (6th Cir. 1966) ("[t]he law of Ohio, which governs in this diversity action, recognizes the action for damages for destruction of a business as measured by the difference between the value of the business before

16

and after the injury or destruction"); *see also id*. at 613 ("the proper method of valuing a business to determine injury is the capitalization of the business' earnings over a reasonable period").

  Asserting that JGR had no business value at the time of the breach, Thomasville relies on *Bishop v. East Ohio Gas Co.*, 41 Ohio Law Abs. 353, at *7 (Ohio App. 8 1943) ("[t]he value of the business can be determined by capitalizing at a fair rate of return, the average annual profits (or net income) for a reasonable number of years") and *Zimmerman v. The Isaly Dairy Co.*, 165 Ohio St. 354, 356 (Ohio 1956) (in addition to capitalization of past profits, a party may seek loss of future profits, if the evidence is not speculative). "Thus, where a regular and established business is wrongfully injured, interrupted, or destroyed, its owner may recover the damages sustained, provided he makes it appear that his business was of such character, and that it had been successfully conducted for such a length of time, that his profits from it are reasonably ascertainable. Since the value of a business depends mainly on the ordinary profits derived from it, the value of the business cannot be determined without showing what the usual profits are; the value of the business can then be determined by capitalizing at a fair rate of return the average annual profits for a reasonable number of years." *Raybourn v. Buroker*, No. 82-CA-61, 1983 WL 2552, * 8 (Ohio App. 2 Nov. 22, 1983) (citing *Taylor v. B. Heller & Co.*, 364 F. 2d 609 (6th Cir. 1966)).

  Although the law of the case is that JGR was awarded zero lost profits, Thomasville does not seem to challenge JGR's right to have lost profits, including future lost profits, considered as part of the overall calculation of "loss of business value," even though no actual award of lost profits will be permissible. Rather, Thomasville's argument seems to be challenging either the *method* of valuation used by plaintiff's expert *or* the application of that method to the facts of this case.

17

These are issues best raised under Fed. R. Evid. 702,[17] which requires analysis by the trial court as to whether "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

As of the date of this Opinion, three motions in limine have been filed and fully briefed. They have been referred to Magistrate Judge Kathleen Burke for a hearing, including a *Daubert* hearing, and a Report and Recommendation on an expedited schedule.

> **3.      Whether JGR Should be Allowed to Recover "Return on Investment" Damages, Also Referred to as "Lost Opportunity Costs"**

JGR asserts that, in addition to "loss of business value" damages, it should be entitled to recover for loss of "return on investment."

Prior to the 2006 trial, JGR had proposed the following jury instruction, which briefly describes (in the italicized language) the nature of these damages:

> The damages being claimed by JGR in this case are the loss of profits that JGR would likely have earned from its business over a period of several years after November, 1992 had Thomasville's breach of contract not occurred; *JGR's loss of the opportunity to invest those profits;* and the amount of interest that JGR will now have to pay Thomasville (by reason of Thomasville's judgment against JGR) because JGR's breach of contract prevented JGR from generating sufficient funds to pay Thomasville for Thomasville merchandise.

(Doc. No. 182, at 3, italics added.) Judge Aldrich did not give this instruction. During a chambers conference discussing these matters, Thomasville objected to allowing JGR to submit any evidence of "lost opportunity costs" because, in its view, that should be entirely covered by prejudgment interest, a question solely for the court, not the jury. Judge Aldrich indicated that she did not want to determine whether JGR would be entitled to prejudgment interest until after

---

[17] It may also require analysis under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

she knew whether there would be a judgment in JGR's favor.  Instead she created a verdict form that asked the jury to separately consider "lost profits damages" and "opportunity cost damages," the latter having roughly (but not entirely) the same purpose as prejudgment interest. After the trial, on JGR's motion to amend the judgment and Thomasville's motion for remittitur, Judge Aldrich determined that JGR was entitled to $2,208,149.41 in prejudgment interest on the $3.3 million in  lost profits damages, but that the amount was completely set off by the $3.53 million in opportunity cost damages. *See* Doc. No. 208.[18]

This case is now before the Court for a retrial on the question of damages, specifically, "on damages for loss of business value." 550 F.3d at 533. The Sixth Circuit overturned the previous jury verdict awarding both lost profits and loss of opportunity costs, rejecting the former because JGR had waived any appeal of the first award of $0 lost profits and rejecting the latter because it was entirely dependent on the improper award of lost profits.[19] The Sixth Circuit expressly declined to rule on the propriety of this type of damages, a matter which had been raised by Thomasville on appeal. *See* 550 F.3d at 533, n.1. However, the Circuit was quite clear that it was remanding for a new trial solely on one issue: "damages for loss of business value." Obviously, it was of the view that none of the other issues raised by the parties were part of this remand. This Court will narrowly construe the remand and conduct a retrial solely on "damages for loss of business value," as instructed by the Sixth Circuit.

---

[18] Judge Aldrich permitted recovery of the higher amount awarded by the jury because, in her view, prejudgment interest and "opportunity cost damages" were similar but not identical, with opportunity costs covering more than just the element of interest. (*See* Doc. No. 208, at 8.)

[19] In a report prepared for the second trial, JGR's expert asserted that JGR should be able to claim "opportunity costs," which he defined as "the reasonable uses that JGR could have made of the profits that would have been available to the Company but for the actions of Thomasville." (Doc. No. 240-2, at 3.)

JGR also argues that it should be allowed to have a jury consider whether part of its lost opportunity related to losses due to a proposed third and fourth store. On February 24, 2006, Judge Aldrich ruled that, although there was evidence that a second store was more than mere speculation, the same could not be said for a third and fourth store. (*See* Doc. No. 148.) JGR argues that this was a ruling on a motion in limine based on a limited record and that the 2006 trial record includes testimony which supports the probability that, had JGR stayed in business, it would have opened a third and fourth store, and that, because the breach drove JGR out of business, part of its lost opportunity costs are attributed to the loss of a third and fourth store, as well as the second store.

Thomasville argues that JGR is essentially asserting the "new evidence" exception to the law of the case doctrine, *see Coal Resources, Inc. v. Gulf & Western Indus., Inc.*, 865 F.2d 761, 767 (6th Cir. 1989) (recognizing the exceptional circumstance where "evidence in a subsequent trial was substantially different"), but that this exception does not apply because the evidence now relied upon by JGR is not new. Thomasville also points out that JGR did not appeal this evidentiary ruling and is barred from relitigating the ruling.

Thomasville's latter argument is the simpler way to approach this issue. JGR did, indeed, fail to appeal Judge Aldrich's ruling and has, therefore, waived any challenge to the ruling. Even so, this Court believes that Judge Aldrich had deposition testimony similar to the testimony ultimately submitted at the 2006 trial when she decided that there would be no consideration of a third and fourth store because it would simply be too speculative. This Court accepts that ruling as the law of the case and agrees that no evidence relating to a third or a fourth store will be submitted to the jury.

That said, since prejudgment interest on any damages for loss of business value is a matter for the Court, should a jury award JGR damages for loss of business value, this Court will then determine whether prejudgment interest should be awarded and, if so, in what amount.

**4.      Whether JGR Should be Awarded an Amount Equal to the Interest on the November 15, 1999 Judgment**

JGR asserts that it should be awarded an amount equal to the interest it will be forced to pay on the November 15, 1999 judgment asserting that, had Thomasville not breached the contract, JGR would have stayed in business and would have been able to pay on its account with Thomasville. In other words, JGR would have had to pay for the furniture, but there would have been no interest.

This issue was raised by JGR at the third appeal, but it was not addressed by the Sixth Circuit, nor was it included in the remand for retrial on "damages for loss of business value." In light of this narrow focus of the third appeal's remand, the Court must conclude that this issue regarding interest is not an issue for retrial.

Further, a judgment is a judgment. JGR made the choice not to challenge the 1999 Judgment nor to pay it for all these years. Had it paid the judgment promptly, it would not now be facing the sizeable accumulation of post-judgment interest. Even so, that is not an issue that can or will be addressed on retrial.

## V.  CONCLUSION[20]

Thomasville's motion for summary judgment (Doc. No. 239) is **DENIED**. The Court reiterates that the instant Memorandum Opinion and Order replaces entirely the previous orders (Doc. Nos. 256 and 267) which are both **VACATED**. The Court further clarifies that, to be true to the remand on the third appeal, the sole issue remaining for trial is "damages for the loss of business value." [21]

**IT IS SO ORDERED**.

Dated: November 11, 2011

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[20] Thomasville has made two additional arguments which this Court need not address:

(1)     JGR cannot recover damages for pre-breach conduct. Thomasville criticizes in some detail parts of JGR's expert's report asserting that the expert relied on pre-breach conduct to inflate JGR's damages. This is a matter for consideration on motions in limine.

(2)     There is no live case or controversy. Thomasville asserts that even using JGR's expert's own methodology and calculations (but *after* removing the three "legal errors" which Thomasville identified), the value of JGR's damages is below the current value (as calculated by Thomasville) of the November 1999 judgment. This is a matter to be raised at trial.

[21] The Court is of the view that  everyone would be better served by a settlement than by another trial and inevitable appeal. The parties and counsel are encouraged to continue efforts to that end before spending large amounts of time preparing for another trial.