IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JGR, INC., | ) | CASE NO. 1:96CV1780 |
| | ) | |
| Plaintiff | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| THOMASVILLE FURNITURE | ) | |
| INDUSTRIES, INC. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant | | |

This matter has been referred to the undersigned Magistrate Judge for a hearing and a Report and Recommendation on the following matters:

1. A *Daubert* hearing regarding the admissibility of the testimony of Plaintiff's Expert Witness, Robert M. Greenwald.
2. Defendant's Motion in Limine #1 to Exclude Damages Testimony that is in Violation of Prior Rulings of Court of Appeals and this Court (filed October 21, 2011) ("Motion in Limine #1") (Doc. 277);
3. Defendant's Motion in Limine #2 to Exclude References to Thomasville's Unpaid Judgment (filed October 21, 2011) ("Motion in Limine #2") (Doc. 278);
4. Defendant's Motion in Limine #3 to Exclude Testimony and Damages based on Alleged Pre-Breach Interference (filed October 21, 2011) ("Motion in Limine #3") (Doc. 279);
5. Plaintiff's Motion for Reconsideration of Portion of the Court's Memorandum Opinion and Order of November 11, 2006[1] that is Contrary to Sixth Circuit's Decision in *Kavokian v. CSX Transportation, Inc.*, 117 F.3d 953 (6th Cir. 1997) ("Motion for Reconsideration") (Doc. 300).

The parties submitted numerous briefs in support of and in opposition to these motions, and, on November 16, 2011, the undersigned Magistrate Judge conducted a hearing on the above referenced matters.

---

[1] Although the caption of Plaintiff's Motion to Reconsider references an Order date of November 11, 2006, the body of the Motion makes clear that it in fact relates to the Court's Order of November 11, 2011.

1

**I.**     *Daubert* **Hearing**

    **A. Standard for Determining Admissibility of Expert Testimony**

Federal Rule of Evidence 702 governs the admissibility of expert testimony ("Rule 702"). *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 528 (6th Cir. 2008). Rule 702, as amended in 2000, reflects the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993). *Id.* Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A trial judge serves as a gatekeeper and is required to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Nelson v. Tennessee Gas Pipeline Company,* 243 F.3d 244 (6th Cir. 2001)(citing *Daubert*, 509 U.S. at 589). This gatekeeping obligation applies to all expert testimony, not just scientific testimony. *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)); *see also In re Scrap Metal*, 527 F.3d at 528. The proponent of the expert testimony bears the burden to show by a preponderance of the evidence that the testimony is admissible. *Nelson*, 243 F.3d at 251.

"A proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements." *In re Scrap Metal*, 527 F.3d at 528-529. "First, the witness must be qualified by "knowledge, skill, experience, training, or education."" *Id.* at 529. (quoting Fed. R. Evid. 702). "Second, the testimony must be relevant, meaning that it "will assist

2

the trier of fact to understand the evidence or determine a fact in issue.'" *Id.* "Third, the testimony must be reliable." *Id.*

Guidance for determining whether testimony is reliable is found in Rule 702. *Id.* Specifically, the Rule indicates that the Court should consider "whether (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. *Daubert* provides additional guidance for evaluating reliability of expert testimony through a non-exclusive checklist. *Id.* These *Daubert* factors include (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant scientific community. *Nelson*, 243 F.3d at 251.[2]

**B. Evaluation of Robert M. Greewald's proposed expert testimony under Rule 702 and *Daubert*.**

This case commenced in 1996. The background facts and lengthy procedural history are set forth in detail in the Court's Memorandum Opinion and Order of November 11, 2011, and will not be repeated herein except insofar as directly pertinent to the matters at issue. Currently, the case is on remand from the United States Court of Appeals for the Sixth Circuit "for a new trial on damages for loss of business value." JGR, Inc. v. Thomasville Furniture Industries, Inc., 550 F. 3d 529, 533 (6h Cir. 2008).

At the *Daubert* hearing that was held to determine the admissibility of the testimony of Plaintiff's damages expert, Robert M. Greenwald, the parties stipulated to the following matters:

---

[2] The *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of reliability of expert testimony." *In re Scrap Metal*, 527 F.3d at 529.

3

1. Robert M. Greenwald ("Greenwald") is qualified by knowledge, skill, experience, training, or education to provide expert testimony regarding damages in this case.
2. Greenwald's proposed expert testimony is relevant, meaning that it will assist the trier of fact to understand the evidence or determine a fact in issue, in this case the fact in issue being damages.
3. Discounted cash flow methodology is an acceptable methodology for determining loss of business value.[3]

Tr. 4-6. [4]

Because the parties stipulated to the foregoing matters, the issue remaining before this Court is whether Greenwald's proposed expert testimony is reliable. Fed. R. Evid. 702. During the Daubert hearing, Greenwald provided a summary of his anticipated testimony as to "the loss of business value" of plaintiff JGR as well as Exhibits setting forth his analysis. Pl. Ex. 17, 18, and 23. Defendant Thomasville raises various arguments as to why this Court should find the Greenwald's testimony unreliable.[5]

Defendant argues that Greenwald's analysis is flawed because it does not appropriately take account of JGR's assets and liabilities at the time of breach. Greenwald testified that he did in fact consider an "asset approach" to valuing a business, i.e., one based on assets and liabilities, but determined that the asset approach was not the best approach in this case. Tr. 10. Specifically, he explained that the asset approach is most appropriate when valuing heavily

---

[3] The Sixth Circuit and other federal courts have recognized that a discounted cash flow valuation is an appropriate methodology for determining a business's going concern value. *Official Unsecured Creditors Committee of Valley-Vulcan Mold Company v. Ampco-Pittsburgh Corp.* 5 Fed. Appx. 396, 399 (6th Cir. 2001); s*ee also United Roaster, Inc. v. Colgate Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981) (en banc). *See also Boyles v. Boyles*, 2001 Ohio App. LEXIS 4520 (2001)(acknowledging the discounted future earnings methodology as a method for valuing a business).

[4] References to the November 16, 2011 hearing transcript, and to the Exhibits marked at that hearing will appear as Tr. ___ and Pl. Ex.___ and Def. Ex___. A final transcript is not yet available. Accordingly, in view of the impending trial date of December 19, 2011, this Report and Recommendation is being issued with citations to the Rough Draft of the November 16, 2011 hearing transcript.

[5] Arguments raised by the Defendant in the *Daubert* hearing overlap with or have been separately raised in Defendant's Motions in Limine. This overlap has at times made it difficult to clearly delineate each argument. This Report and Recommendation attempts to address all of the various issues and arguments as succinctly as possible without confusing the various motions.

4

capital-intensive businesses with limited profits or income and holding companies in liquidation. Tr. 10.  He testified that he does not view JGR as a holding company or a capital intensive company and was advised not to assume that the company was in liquidation.  Tr. 10.  In addition to considering the asset approach, Greenwald also considered two other valuation methodologies: the income approach and the market approach.  Tr. 9, 54-55.  Ultimately, he relied on the income approach.  Tr. 9.

Because Greenwald adequately explained his reasons for using the income approach as well as how he factored in and treated JGR's assets and liabilities,[6] Defendant's argument that Greenwald's testimony and opinion are unreliable because JGR's assets and liabilities were not explicitly factored in or because he chose to use an income approach methodology rather than an asset approach methodology is without merit.[7]  See *Ampco-Pittsburgh Corp.* 5 Fed. Appx. at 399; *United Roaster, Inc. v. Colgate Palmolive Co.*, 649 F.2d at 992 (recognizing the discounted cash-flow valuation methodology as a well-recognized methodology for determining a business's going concern-value).

Defendant also argues that Greenwald's opinion is not based on sufficient facts or data because he did not use JGR's "real world" financials from 1991 and 1992 to determine a baseline for the projected sales numbers used in his discounted cash flow projections.  The essence of this portion of Defendant's argument is that Greenwald is using inaccurate data or is missing data, and therefore, his testimony and opinions resulting therefrom are unreliable.

---

[6] Greenwald testified that, although his business valuation schedules do not specifically itemize the assets and liabilities of JGR, the discounted cash flow methodology does take into account assets and liabilities of a business although they are not specifically quantified.  Tr. 52, 59.

[7] To some extent, Defendant's argument appears inconsistent with its stipulation that the discounted cash flow methodology is an acceptable methodology accepted methodology for valuing a business.

Greenwald testified to his reasoning for not relying on JGR's 1991 and 1992 financials. Greenwald indicated that, after fully reviewing the matter, he determined that JGR's financials from those years were unreliable for establishing projections.[8] In reaching this determination and in establishing a baseline for his opinion as to the loss of business value for JGR's existing store as of the date of breach ("Store 1") (Pl. Ex.18),[9] Greenwald indicated that he analyzed industry data, Thomasville stores, JGR's own history including its financials and business plans, furniture industry statistics and government statistics. Tr. 15-17, 46-49, 74, 78-79. After this full review, he concluded that $150 per square foot was reasonable for the store. Tr. 49. His review also led him to the conclusion that the store should have at least been at the level that JGR had projected. Tr. 17. The sales growth percentages that Greenwald utilized in his projections were derived from a year by year comparison of the U.S. Census Bureau data on sales in the retail furniture industry. Tr. 17.

As noted by the Sixth Circuit, the trial court's task is not to determine whether an expert's opinion is correct but, rather, whether the opinion rests on a reliable foundation, not unsupported speculation. *In re Scrap Metal*, 527 F.3d at 529-530. Where the use of certain data in an expert's analysis is challenged as inaccurate but the expert provides a rationale supported by evidence and/or industry data, the question whether the expert's opinion is accurate goes to the weight of the evidence, not its admissibility. *Id.* at 531-531. Moreover, where an expert provides reasons why he finds the records of a business's actual performance to be unreliable

---

[8] Greenwald, relying in part on information provided by JGR, believes that its performance in 1991 and 1992 was negatively impacted by uncertainty as to whether Thomasville would authorize Furnitureland, JGR's competitor and the former employer of JGR's principal Gerald Yosowitz ("Yosowitz"), to sell Thomasville furniture. Tr. 15, 72-73. Evidence pertaining to this alleged "pre-breach conduct" of Thomasville is addressed below with respect to Motion in Limine #3.

[9] Greenwald also determined the loss of business value of a second store ("Store 2) that had been planned but was not opened before the date of breach, November 15, 1992. P. Ex. 23. This Court's decision allowing Plaintiff to seek damages for Store 2 is based on the fact that there was "at least some minimal factual basis" for Store 2. Doc. 148, Page 5.

6

and unusable for making projections, the expert's reliance on other data will not cause those projections to be deemed so speculative or remote that his opinion should not be presented to a jury. *Falls Steel Tube & Manufacturing Company v. Trumark, Inc.*, 1995 U.S. App. LEXIS 38826, *4 (6th Cir. 1995).

Contrary to Defendant's argument, the analysis performed by Greenwald to determine that the 1991 and 1992 financials of JGR were unreliable is not analogous to the expert's analysis in *Pluck v. BP Oil Pipeline Company*. 640 F.3d 671 (6th Cir. 2011). In *Pluck*, the Sixth Circuit affirmed the exclusion of expert testimony where the expert's opinion was based on "pure conjecture." *Id.* at 679. Greenwald's *Daubert* testimony demonstrates that he did not, without reason or thought, determine that, for purposes of the discounted cash flow analysis, JGR's actual financials for 1991 and 1992 were unreliable. Among other things, he evaluated JGR's business plan, analyzed industry data, considered actual financials from the period of start up until the date of the alleged disruptive acts, and spoke with Yosowitz regarding actual performance (and in fact challenged Yosowitz on a number of his positions). Tr. 15-17, 46-49, 74, 78-79.

Inasmuch as Greenwald did provide a reliable foundation for reaching his conclusions, the weight to be provided to his testimony is for the jury, not this Court. *In re Scrap Metal*, 527 F.3d at 529-530.

### C. Conclusion

Based on the foregoing analysis under Rule 702 and *Daubert*, Greenwald's proposed expert testimony is both relevant and reliable. Therefore, the undersigned Magistrate Judge recommends that Greenwald's proposed expert testimony should be determined admissible under Rule 702 and *Daubert* subject to the limitations noted below.

As explained below, under the law of the case, to the extent that Greenwald's proposed testimony regarding the business value of Store 2 is based on an assumed reduced cost to open that store due to a "reinvestment" of unearned "projected profits" from Store 1,[10] such testimony should be held inadmissible.[11] Also, as further explained below, based on the law of the case pertaining to the speculative nature of Plaintiff's claimed plans to open Stores 3 and 4, Greenwald's proposed testimony and projections assuming that Store 1 and Store 2 would have been expanded had JGR not been able to open Stores 3 and 4 should be held inadmissible.

## II.  Motion in Limine #1

### A.  Defendant claims that JGR cannot claim "lost profits" for Store 2.

**RECOMMENDATION – DENY AS MOOT**

On November 11, 2011, this Court clarified,[12] and the Plaintiff has agreed[13] that the issue at trial, as to both Store 1 and Store 2, will be loss of business value, not lost profits or lost opportunity. Based on the foregoing, at the *Daubert* motion hearing, Defendant Thomasville agreed that its motion to prohibit Plaintiff from claiming damages for lost profits for Store 2 was moot. Both parties have stipulated that damages relating to Store 2, if recoverable at all, are to be determined as part of the loss of business value of Plaintiff JGR. Tr. 12-13. Accordingly, this Court should deny as moot that portion of Defendant's Motion in Limine #1 attacking Plaintiff's lost profits analysis for Store 2.

---

[10] Tr. 64-68.

[11] Doc. 298, Pages 18-21.

[12] Doc. 298, Pages 18-21.

[13] Plaintiff has indicated that it will rely on the law with respect to pre-judgment interest rather than inclusion of "lost opportunity costs." Doc. 300, Page 7, FN 1.

8

**B. Defendant claims that JGR must not be permitted to obviate prior rulings barring recovery for Stores Three and Four by simply *doubling* the size of Store One and Two.**

**RECOMMENDATION – GRANT**

The Supplemental Report of Plaintiff's damages expert, Greenwald, dated October 6, 2011 (Def. Ex. 2), for the first time in the lengthy history of this case, contained damages projections based on an assumed doubling of the size of Stores 1 and 2.  The Supplemental Report states that these projections are based on "new information" provided by Yosowitz to the effect "that if he had been unable, for any reason, to proceed with Stores #3 and #4 as originally planned, he would have expanded the size of both Store #1 and Store #2."  Def. Ex. 2.  As indicated by this Court in its November 11, 2011 Order, it is the law of the case that there will be no evidence relating to a third or fourth store.[14]  The underlying basis for this ruling, that evidence regarding a plan to open a third and fourth store was simply too speculative,[15] applies equally to Plaintiff's attempt to seek damages based on a projected expansion of Stores 1 and 2 that would have been contingent on the outcome of the speculative plans for Stores 3 and 4.

It is therefore recommended that Defendant's Motion in Limine #1 be granted insofar as it seeks to exclude evidence relating to any proposed expansion of Store 1 or Store 2.

**C. Defendant claims that Greenwald's "Discounted Cash Flow" damages are simply "Lost Profits" that the Court of Appeals has ruled are not recoverable.**

**RECOMMENDATION – DENY IN PART, GRANT IN PART**

While the Sixth Circuit has precluded Plaintiff's recovery of lost profits in this case, the equally clear mandate from the Sixth Circuit is that Plaintiff may seek damages for loss of business value.  As discussed in the above *Daubert* analysis, a discounted cash flow valuation is

---

[14] Doc. 298, Page 20.

[15] Doc. 298, Page 20.

9

a well-recognized methodology for determining a business's going concern values. *Ampco-Pittsburgh Corp.* 5 Fed. Appx. at 399; s*ee also United Roaster*, 649 F.2d at 992, and the parties have stipulated that the discounted cash flow methodology is an acceptable methodology for determining loss of business value.  Furthermore, where an income producing asset is lost, the fair market value may be based in whole or in part on a buyer's projections of what income the buyer might derive from the asset in the future.  *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2nd Cir. 2000).  While future profits may not be recoverable, that does not preclude projection of future profits as a means for determining the value of a business.  *See Board of County Commissioners of Hamilton County v. Flanco Realty Co.*, 1999 Ohio App. LEXIS 2890 (1999).

Based on the foregoing, with regard to Store 1, even though the discounted cash flow methodology contains, as part of its calculations, a projection of future earnings, which also might be referred to as "lost profits," that does not mean that Plaintiff's proposed expert testimony is inadmissible.

However, with regard to Store 2, the law of the case precludes recovery for lost profits or "lost opportunity costs."  Doc. 298, Pages 18-21.  To allow Plaintiff's expert to use, in his analysis of the value of Store 2, unearned "projected profits" from Store 1 for "reinvestment" into opening Store 2 would be contrary to the law of the case.  Since Store 2 did not exist at the time of breach, a willing buyer would have been required to invest the full cost of a new store ($225,000.00) to start up a second store rather than "reinvest" unearned "projected profits" from Store 1.  To be consistent with the law of the case, in reaching a business valuation for Store 2, the actual cost of opening a second store must be utilized in the calculations, not a cost based on an assumed "reinvestment" of unearned "projected profits."

It is therefore recommended that Defendant's motion to exclude testimony on the basis that the valuation includes a component of lost profits or lost opportunity costs be granted in part and denied in part. As to Store 1, Greenwald's testimony should not be limited or excluded. As to Store 2, to the extent that Greenwald's proposed testimony is based on a "reinvestment" of unearned "projected profits" rather than the actual cost of opening a new store, this Court should hold such testimony inadmissible.

### D. Defendant claims that Greenwald should not be allowed to change the profit rate used in his damages calculations.

**RECOMMENDATION - DENY**

Plaintiff asserts that a 3.8% profit rate used by Greenwald is based on information provided by Thomasville during discovery. According to Plaintiff, that rate is consistent with net profits generated by two other furniture stores selling Thomasville furniture in Northeast Ohio as well as marketing materials Thomasville itself provided to its retailers. Although the 3.8% rate was not initially included in Greenwald's valuation of JGR, the 3.8% percentage cannot be said to be without a factual basis. *See Conwood Company v. United States Tobacco Company,* 290 F.3d 768, 791 (6th Cir. 2002). Further, because the Defendant has had an opportunity to depose Greenwald following the addition of this assumption to Greenwald's report, allowing Plaintiff to present this evidence at trial would not be unfairly prejudicial to the Defendant. The 3.8% rate goes to the weight of Greenwald's testimony, not to its admissibility. *In re Scrap Metal,* 527 F.3d at 529-530.

It is therefore recommended that Defendant's motion to exclude the presentation of evidence which includes calculations using a 3.8% profit rate should be denied.

11

### III. Motion in Limine #2 and Motion to Reconsider

Because Motion in Limine #2 and the Motion to Reconsider are both tied to the 1999 Judgment entered in favor of Defendant against Plaintiff ("the 1999 Judgment"), the two motions will be reviewed and considered together.

### A. Defendant claims that Plaintiff should be precluded from introducing evidence relating to the 1999 unpaid judgment entered against JGR and the underlying debt.

**RECOMMENDATION - DENY**

On March 16, 2005, Magistrate Judge McHargh entered a Memorandum and Order relating to the specific issue raised again in Defendant's Motion in Limine #2, i.e., whether Plaintiff should be precluded from referring to Thomasville's judgment against JGR. Doc. 127. In his Order, Magistrate Judge McHargh, determined that such evidence is relevant and not unfairly prejudicial. Doc. 127. This March 16, 2005 Order was not objected to by Thomasville. Accordingly, it constitutes law of the case. Moreover, the undersigned Magistrate Judge agrees with Judge McHargh's reasoning. The 1999 Judgment does have some relevance to the damages at issue in this case. Defendant argued that Judge McHargh's ruling should not be deemed controlling now because the damages recoverable in the upcoming trial are not lost profits, as they were thought to be at the time of that ruling, but rather loss of business value damages. Tr. 129-131. That argument is unpersuasive, particularly because Defendant apparently intends to present expert testimony and to argue that Plaintiff's liabilities at the time of breach, including specifically the liability underlying the 1999 Judgment, made Plaintiff's business practically worthless. Tr. 107-113, 116.

While this evidence is relevant, its relevance is limited and its use therefore should also be limited, as noted by Magistrate Judge McHargh. Judge McHargh cited to Plaintiff's argument to the first jury that heard this case as an inappropriate use of the 1999 Judgment.[16] Accordingly, this Court should deny Defendant's Motion in Limine #2 insofar as it seeks to preclude Plaintiff from referring to the 1999 Judgment or the underlying liability. However, Plaintiff and its counsel should be cautioned against inappropriate references and the Court should consider a limiting instruction to the jury on this point.

### B. Plaintiff seeks reconsideration of the Court's ruling that it may not seek consequential damages equal to the interest on the 1999 judgment.

**RECOMMENDATION - DENY**

Plaintiff seeks to recover as consequential damages in this case an amount equal to both the pre- and post-judgment interest it owes on the 1999 Judgment. On November 11, 2011, this Court ruled that the Plaintiff may not seek as damages an amount equal to the pre- and post-judgment interest on the 1999 Judgment. On November 14, 2011, Plaintiff filed a Motion to Reconsider this Court's ruling (Doc. 300).

Plaintiff cites *Kavorkian v. CSX Transportation, Inc.*[17] in support of its Motion for Reconsideration. Plaintiff is correct that, under *Kavorkian*, the Sixth Circuit's failure to reach an issue raised on appeal does not foreclose this Court's consideration of the issue on remand. However, Plaintiff fails to recognize that, even though the Court of Appeals did not reach this issue, that does not mean Plaintiff is automatically entitled to present this claim to the jury. This

---

[16] "[N]ow that is what Thomasville got a judgment for and now its our turn." Doc. 127, Page 4.

[17] 117 F.3d 953 (6th Cir. 1997).

13

Court, as a matter of law, may and has in fact determined in its November 11, 2011 Order[18] that said claim may not proceed to a jury.

The 1999 Judgment resulted from the Court's summary judgment liability ruling in favor of Thomasville in Case No. 1:96CV1424 on its claim for monies owed to it by JGR for furniture purchased by JGR. Doc. 36. On September 27, 1999, the parties entered the following stipulation as to the amount of the Judgment:

> If Thomasville Furniture, Inc. is entitled to recover on its account, then it is agreed that the amount awarded shall be $536,931.94 for goods sold plus interest at the rate of 10% from 7/15/93 to 10/0199 in the amount of $332,898.00 for a total amount of $869,829.94 in damages.

This stipulation was later incorporated into a judgment in favor of Thomasville and against JGR in the amount of $869,829.94.[19] JGR did not appeal the liability ruling against it or any other aspect of the 1999 Judgment. On March 21, 2005, the Court in this case entered an order that Thomasville shall be entitled to offset the 1999 Judgment against any damages awarded to JGR in the amount of $869,829.94, plus post-judgment interest. Doc. 131.

It was not until 2006 that Plaintiff first asserted its claim for consequential damages in the amount of interest owed on the 1999 Judgment. Tr. 117. Plaintiff acknowledges that it has found no case in which a party recovered, as consequential damages, an amount equal to the interest that party owed on a judgment it had stipulated to. Tr. 124. As its rationale for its novel damages theory, Plaintiff has argued: (1) but for Defendant's breach of contract, Plaintiff would have paid Thomasville the amount it owed for furniture and "JGR would never have had to pay Thomasville any pre-judgment or post-judgment interest on that indebtedness, because there

---

[18] Doc. 298.

[19] Doc. 36. Order dated December 20, 1999, Case No. 1:96CV1424.

14

never would have been a lawsuit by Thomasville, let alone a judgment;"[20] and (2) JGR is entitled to have the jury decide whether any judgment would have been taken - - and therefore whether any pre-judgment or post-judgment interest would ever have been assessed against JGR - had there been no breach of contract by Thomasville.[21]"

The parties have briefed the question of whether Plaintiff's damages theory is an impermissible collateral attack on the 1999 Judgment.[22] Both parties rely on *Ohio Pyro*, which defines a collateral attack as "an attempt to defeat the operation of a judgment, in a proceeding where some new right derived from or through the judgment is involved." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 378 (2007). Further, a collateral attack is "an attempt to undermine a judgment through a judicial proceeding in which the ground of the proceeding (or defense in the proceeding) is that the judgment is ineffective. *Id.* (quoting Black's Law Dictionary (8th Ed. 2004)).

As noted in *Ohio Pyro*, "[i]n our jurisprudence, there is a firm and longstanding principle that final judgments are meant to be just that – final." *Id.* at 380. "[S]ubject to only rare exceptions, direct attacks, i.e., appeals, by parties to the litigation, are the primary way that a civil judgment is challenged." *Id.* It therefore, "necessarily follows that collateral or indirect attacks are disfavored and that they will succeed only in certain very limited situations." *Id.* The rationale for disfavoring collateral attacks does not apply "when the issuing court lacked jurisdiction or when the order was the product of fraud." *Id.*

Plaintiff's own arguments in support of why this Court should allow it to seek the amount of the pre- and post- judgment interest on the 1999 Judgment as consequential damages

---

[20] Doc. 281, at 1.

[21] Doc. 296, at 7.

[22] Docs. 306 and 307.

demonstrate why such a claim is a collateral attack on the 1999 Judgment. Plaintiff agrees that the 1999 Judgment is "absolutely valid," and attempts to assure this Court that it is not attacking the judgment. Tr. 122. However, Plaintiff argues that JGR is entitled to have the jury decide whether any judgment would have been taken had there been no breach of contract by Thomasville. Doc. 296, Page 7.

Further, it is Plaintiff's expectation that, should it be allowed to seek and should the jury award it damages for both loss of business value and an amount equal to the interest on the 1999 Judgment, the combined total of those two damage awards would be set off against the 1999 Judgment (including pre- and post-judgment interest). Tr. 126. Plaintiff's attempt to describe what would occur should Plaintiff be allowed to seek these consequential damages demonstrates that it does in fact seek to "undermine" and "defeat" the operation of the 1999 Judgment. *See Ohio Pyro*, 115 Ohio St. 3d at 378. Clearly, if Plaintiff is successful, Defendant effectively will be deprived of a large part of the benefit of the 1999 Judgment. Thus, Plaintiff's attempt to characterize its claim as a claim for consequential damages rather than as a collateral attack on the 1999 Judgment is unpersuasive

The next question is whether the attack is a permissible collateral attack. Under *Ohio Pyro,* Plaintiff's attack is impermissible because Plaintiff does not claim that this Court was without jurisdiction to issue the 1999 Judgment, nor does Plaintiff claim that the judgment was the product of fraud. *See Ohio Pyro*, 115 OhioSt.3d at 380. The cases upon which Plaintiff relies are distinguishable because the parties seeking damages associated with a prior judgment in those cases were not the same parties as the parties involved in the prior judgment. *See Fidelity & Deposit Company of Maryland v. Krebs Engineers*, 859 F.2d 501, 505-506 (7th Cir. 1988); *Cedarburg Light & Water Commission v. Glens Fall Ins. Co.*, 42 Wis.2d 120, 125 (1969);

*Thayer v. Diver*, 2009 Ohio App. LEXIS 1796, \*\*26 (2009) (finding that the plaintiff's claims were not a collateral attack on the integrity of the judgment in the receivership case, in part, because the plaintiff was not seeking damages from the company that was the subject of the receivership but rather from an individual). In contrast to the cases relied upon by Plaintiff, JGR and Thomasville were both parties to the 1999 Judgment.

*Res judicata* principles may also apply to preclude Plaintiff from proceeding with its claim to seek pre- and post- judgment interest on the 1999 Judgment as consequential damages. As noted in *Ohio Pyro*, "the concept of *res judicata* is related in some respects to the collateral-attack doctrine." *Ohio Pyro*, 115 Ohio St.3d at 558. "*Res judicata* principles can apply to prevent parties and those in privity with them from modifying or collaterally attacking a previous judgment." *Id.* The Sixth Circuit's analysis in *Freese* also demonstrates the interconnectedness between the two concepts. *See Freese v. Corning Glass Works*, 837 F.2d 1091, 1988 U.S. App. LEXIS 1036, \*7-8 (6th Cir. 1988) (relying on *res judicata* principles when rejecting the plaintiffs' argument that their claim was not a collateral attack on a prior judgment). As a result and because JGR did appeal the grant of summary judgment in Thomasville's favor, Plaintiff should be precluded from attempting to now undermine the 1999 Judgment.

Based on the foregoing, this Court should deny Plaintiff's Motion to Reconsider because Plaintiff's effort to recover damages in the amount of interest it owes on the 1999 Judgment is an impermissible collateral attack on that judgment and/or is barred by principles of *res judicata*.[23]

---

[23] Defendant also argues that Plaintiff's consequential damages theory is speculative. In light of the foregoing collateral attack analysis, this argument has not been addressed herein.

17

**IV.    Motion in Limine #3**

**RECOMMENDATION – DENY IN PART, GRANT IN PART**

Defendant asserts that testimony relating to alleged conduct by Thomasville pre-dating November 15, 1992 ("the pre-breach conduct"),[24] is irrelevant, prejudicial and, if allowed, would result in Plaintiff recovering damages for conduct that, under the law of the case, is not actionable.

As with most, if not all, of the issues raised by the parties in this case and the Motions presently before this Court, this issue has been vigorously argued by both parties. Plaintiff argues that, without a fulsome presentation of testimony regarding the alleged pre-breach conduct, it cannot provide needed context to the jury, nor can it defend against Defendant's anticipated argument that Plaintiff's business was failing at the time of breach and therefore had no value, nor can it provide the foundation needed for its damages expert's testimony.

Evidence relating to conduct between the parties that pre-dates the breach is relevant to the extent that it will allow the Plaintiff to rebut Defendant's evidence and argument to the effect that Plaintiff's business had zero value as of the date of the breach and will lay a foundation for the Plaintiff's expert. However, Plaintiff's asserted need to provide the jury a fulsome presentation of the pre-breach conduct as context for the case as a whole raises the specter of unfair prejudice to Defendant.

---

[24] The "pre-breach conduct" consists of Plaintiff's allegations that beginning sometime in early 1991 Thomasville began to have conversations with Furnitureland, a direct competitor of JGR and former employer of Gerald Yosowitz, a principal of JGR. Tr. 15. These alleged conversations led to alleged uncertainty for JGR, inconsistency in advertising strategy, and a discouraged or demoralized sales force. Tr. 72-73

18

The pre-breach conduct previously has been determined by the Court not to be actionable.[25] Plaintiff does not dispute this. Tr. 148. Defendant was not prohibited from contracting with other retail furniture stores, i.e., Plaintiff's contract with Thomasville, by its terms, was a non-exclusive contract. Notwithstanding this, Plaintiff has in the past presented evidence of Defendant's negotiations with a competitor of Plaintiff in such a way as to imply that any such action by Defendant was wrongful and Plaintiff is likely to attempt to do so again at the upcoming trial. Indeed, the April 2009 report of Plaintiff's expert Robert M. Greenwald refers to Defendant's pre-breach actions as "improper" and as "interference." Def. Ex. 1 at 3, 9, 10. At the hearing on November 16, 2011, when the Court asked Plaintiff's counsel about the danger of prejudice from testimony and argument regarding the pre-breach conduct, Plaintiff's counsel responded:

> And this notion about prejudice, we can't help it if they didn't do nice things. That is their fault, not ours. We can't help it if their conduct caused damage to our client. <u>We can't help it if that conduct caused a jury to find they breached the contract and caused two juries to award substantial damages.</u> We can't help it. We are sorry that the evidence is prejudicial to them, but we are entitled to present that evidence.

Tr. P. 148, lines 3-10(emphasis supplied).

Even though the evidence may be relevant for a limited purpose, the Court must determine whether the "probative value [of the evidence] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."[26] In light of Plaintiff's past attempts to use the pre-breach conduct evidence to imply that Defendant's acts prior to November 15, 1992 were wrongful, the undersigned Magistrate Judge believes that,

---

[25] Doc. 29, Pages 5-9 (setting forth the procedural history and various rulings in this Court and in the Court of Appeals).

[26] Fed. R. Evid. 403.

19

unless strict limitations are placed on Plaintiff's use of evidence regarding the pre-breach conduct, the "probative value" of the evidence may be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." [27]

Considering the foregoing, Defendant's Motion in Limine #3 should be denied in part and granted in part. The Plaintiff should be permitted to offer limited testimony regarding Thomasville's conduct prior to November 15, 1992 to establish a foundation for its expert's report and in defense of any argument by Defendant that the value of JGR was zero. However, Plaintiff should be precluded from offering testimony in this regard that includes the use of terms such as "improper," "wrong," "misleading," "illegal," "interference", or other similar terms. Also, if Plaintiff's expert report is to be admitted into evidence, any references to such terms that are contained in Plaintiff's expert report should be stricken and replaced with more neutral text. Further, the Court should caution Plaintiff and its counsel against offering testimony or argument regarding Thomasville's conduct prior to November 15, 1992 for any reasons other than as provided herein.

As an alternative to, or in addition to these recommendations, the Court should encourage the parties to reach a stipulated statement of facts regarding the parties' conduct before the date of the breach, November 15, 1992, and/or should provide a limiting instruction to the jury on this point.

November 22, 2011

_Kathleen B. Burke_
Kathleen B. Burke
United States Magistrate Judge

---

[27] Fed. R. Evid. 403.