**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JGR, INC., PLAINTIFF, | ) | CASE NO. 1:96 CV 1780 |
| | ) | JUDGE SARA LIOI |
| vs. | ) | |
| THOMASVILLE FURNITURE INDUSTRIES, INC., DEFENDANT. | ) | **MEMORANDUM OPINION AND ORDER** |

Before the Court is the Report and Recommendation of Magistrate Judge Kathleen B. Burke (Doc. No. 308) addressing (1) the admissibility of Plaintiff's expert's testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); (2) Defendant's three motions in limine (Doc. Nos. 277,[1] 278,[2] and 279[3]); and (3) Plaintiff's motion for reconsideration of a portion of the Court's Memorandum Opinion and Order of November 11, 2011 (Doc. No. 300).[4]

Each party filed objections (Doc. Nos. 310 and 311) and responses to the respective objections (Doc. No. 313 and 312). A transcript of the hearing conducted by the

[1] Plaintiff filed a memorandum in opposition (Doc. No. 280), Defendant filed a reply (Doc. No. 292), and Plaintiff filed a sur-reply (Doc. No. 295).

[2] Plaintiff filed a memorandum in opposition (Doc. No. 281), Defendant filed a reply (Doc. No. 293), and Plaintiff filed a sur-reply (Doc. No. 296). At the Magistrate Judge's request following the *Daubert* hearing, each party filed a supplemental brief. (Doc. Nos. 306 and 307.)

[3] Plaintiff filed a memorandum in opposition (Doc. No. 282), Defendant filed a reply (Doc. No. 297-1), and Plaintiff filed a sur-reply (Doc. No. 299).

[4] Defendant filed a memorandum in opposition (Doc. No. 302).

Magistrate Judge has also been filed (Doc. No. 309) and the parties have jointly stipulated to the exhibits that were used during the hearing (Doc. No. 314).

Pursuant to Fed. R. Civ. P. 72(b)(3), this Court now gives *de novo* consideration to those parts of the R&R that have been properly objected to.

## DISCUSSION

### A. Admissibility of Plaintiff's Expert's Testimony under *Daubert*

The R&R notes that the parties stipulated to the following:

1. Robert M. Greenwald ("Greenwald") is qualified by knowledge, skill, experience, training, or education to provide expert testimony regarding damages in this case.

2. Greenwald's proposed expert testimony is relevant, meaning that it will assist the trier of fact to understand the evidence or determine a fact in issue, in this case the fact in issue being damages.

3. Discounted cash flow methodology is an acceptable methodology for determining loss of business value.

(R&R at 4.) Neither party has objected to this statement of their stipulations; therefore, they are accepted.

The R&R stated that the only issue remaining is whether Greenwald's proposed expert testimony is reliable under Fed. R. Evid. 702 and concluded that, "[b]ecause Greenwald adequately explained his reasons for using the income approach as well as how he factored in and treated JGR's assets and liabilities, Defendant's argument that Greenwald's testimony and opinion are unreliable because JGR's assets and liabilities were not explicitly factored in or because he chose to use an income approach methodology rather than an asset approach methodology is without merit." (R&R at 5, footnote omitted.) The R&R concluded that the testimony was reliable and the weight to be provided to Greenwald's testimony was for the jury to decide. Defendant objects to these conclusions. (*See* Doc. No. 311 at 2-11.)

Defendant asserts that, to determine the "business value" of JGR (i.e., "what a willing buyer would pay a willing seller for the JGR business, prior to the breach of contract[,]" [*Id*. at 3]), Greenwald "chose to estimate that amount by evaluating the net income stream that a buyer could expect to earn from the business into perpetuity, discounted to 'present value' (the date of the hypothetical sale, prior to the breach) by an appropriate discount rate." (*Id*., citing Transcript ["Tr."] 9, 19.) Greenwald testified that assets and liabilities are taken into account in the discounted cash flow methodology by applying a "standard" profit percentage (he used 3.8%) to the projected sales of the business. This profit percentage assumes or takes into account an average level of assets and liabilities.

Defendant asserts that Greenwald also testified that "[t]o the extent that the assets or liabilities [of a business] are significantly askew from industry norms, adjustments may be required." (Tr. at 56.) Defendant argues that JGR's liabilities were significantly askew from industry norms, but Greenwald failed to make an appropriate adjustment. In fact, although JGR had total liabilities of $784,692 against total assets of only $615,924, Greenwald adjusted JGR's liabilities at the time of the breach *downward* by $454,207 so that JGR's assets and liabilities would be in line with industry norms. (2009 Greenwald Report, Ex. XIV [Doc. No. 314-5 at 38].) Greenwald testified that he made this adjustment "based on [his] perception of the impact of what [he] call[ed] the alleged inappropriate actions of Thomasville." (Tr. at 57.)

While he had a tendency to obfuscate and not directly answer a question posed to him on cross-examination, Greenwald testified (and included in his 2009 Report) that there are several methods for valuing a business: market-based (which he rejected); asset-based (which he also rejected), and income-based (which includes the capitalized income or cash flow methods, which he rejected, as well as the discounted cash flow method he ultimately chose to use) (Doc.

No. 314-5 at 5- 9.) Some methods require "calculation based on revenue or profit, and then an adjustment for certain assets and certain liabilities." (Tr. at 55.) But "[i]n the discounted cash flow method, the underlying theory is that the cash flow takes into account all assets, tangible and intangible, and all liabilities, booked or otherwise, as part of the conclusion." (*Id*.)[5] In other words, "the discounted cash flow method already takes into account all assets and liabilities of a company." (*Id*. at 56.)[6] Defendant's counsel, at the hearing, specifically asked why no adjustments were made by Greenwald:

> Q. Mr. Greenwald, is it a fair statement that what you're saying is you believed that no adjustments were required to the cash flow analysis to take into account the actual liabilities of JGR, because you didn't believe those actual liabilities were a reflection of what should have occurred to JGR, but they were the function of these bad acts; and so, therefore, you didn't need to make any adjustments?
>
> A. No. In fact, I actually did make the adjustments, but those adjustments don't impact this [discounted cash flow] analysis.
>
> Discounted cash flow assumes the assets and liabilities. The other methods are the ones that needed it, and that's why I did it for those methods."

(*Id*. at 59.) As Greenwald explained, since he ultimately decided to use the discounted cash flow method for valuing the business,[7] rather than other available methods, he did not need to make adjustments.

---

[5] In his 2009 Report, Greenwald noted that the income approach to valuing a business "may indicate the fair market value of a company based on the value of the economic income that the business can reasonably expect to generate in the future. The value of the business may be considered as the present value of the economic income expected to be generated by the investment." (Doc. No. 314-5 at 9.) "The discounted cash flow method utilizes the projected net cash flow stream for a set number of periods in the future and discounts such results and the 'terminal value' to a cumulative present value." (*Id*.) Greenwald started his analysis with the December 31, 1992 balance sheet, since this was the only available data close to the November 15, 1992 breach date. (Tr. at 57.)

[6] At the hearing, the Magistrate Judge described it as follows: "assets and liabilities are sort of baked into the discounted cash flow analysis," (Tr. at 69) and Greenwald concurred.

[7] He stated in his 2009 Report: "We attempted to normalize JGR's income and cash flows to determine whether the Company's historical results are indicative of its future performance. Our review of JGR's income and cash flows since early 1991 indicated that they were unreliable as an indication of future performance as they were impaired due to the interference of Thomasville (and its breach on November 15, 1992). Thus the capitalized income or cash

Defendant objects, asserting that "it belies common sense that a 'willing buyer' considering a value for JGR would totally ignore the actual liabilities of the business, or at least ensure that the assets and liabilities of JGR were not different from those of an 'ordinary' furniture business." (Doc. No. 311 at 10.) But Greenwald testified that when he valued JGR at $970,000 as of November 15, 1992, he was not saying that a buyer would necessarily pay that. Rather, he noted that these matters are negotiated. A buyer may or may not agree to assume liabilities. (Tr. at 62.)

Defendant also objects that it "cannot be held 'accountable' because of 'pre-breach wrongful conduct' for the fact that JGR was *not* an 'ordinary' furniture business." (Doc. No. 311 at 10, emphasis in original.) It asserts that "[t]o change the *valuation* of JGR by ignoring the actual, excessive liabilities of the company would be to ascribe a damages consequence to Thomasville's pre-breach conduct." (*Id*.) According to Defendant, because Greenwald failed to adjust assets and liabilities that were out of line with industry norms, his application of the discounted cash flow method for valuing JGR is flawed and his testimony should be barred. Defendant argues: "To permit that approach is, in reality, allowing the jury to assess damages for the non-actionable pre-breach conduct of Thomasville." (*Id*. at 11.) This argument ignores the fact that Greenwald testified that his analysis determines a fair market value, "which is the world of possible buyers dealing with the world of possible sellers[.]" (Tr. at 62.) In other words, he was trying to value the company as if no pre-breach conduct had occurred. He acknowledged that an actual negotiation with a particular buyer "could result in something different." (*Id*.)

---

flow method would be inappropriate to used [sic] in our value analysis without significant adjustments reversing those effects. Therefore, to quantify the fair market value of the Company based on income analysis, we focused primarily on the discounted cash flow method." (Doc. No. 314-5 at 9.)

When questioned about Plaintiff's Hearing Exhibit 17, which shows projected sales for JGR's first store for 1991, 1992, and 1993, Greenwald testified that he compared "the financial information of JGR for the initial stages of operation up to the date of the alleged disruptive acts" to "industry data and to JGR's business plans[.]" (Tr. at 17.) He "determined that its sales were well -- significantly higher than the initial business plan, as well as the average business in that industry at $150 per square foot." (*Id*.) He "tried to isolate the effect of the initial opening and the effect of the initial sale, as well as seasonality, by comparing it to industry data." (*Id*.) Greenwald concluded "that this store should have been at least at the projected level that JGR projected. And [he] utilized an industry standard of sales per square foot [$150] to determine the baseline sales." (*Id*.) Greenwald multiplied the 15,000 square feet of sales space at JGR's first store by $150 and determined that baseline sales in 1991 should have been $2,250,000. He left 1992 stagnant and applied the industry growth standard for 1993. (*Id*. at 17-18.) From there, he projected baseline sales from 1994 through 1998, applying industry sales growth figures supplied by the U.S. Census Bureau data on sales in the furniture retail industry. He further determined net earnings before taxes by applying a 3.8% rate based on data supplied from two nearby Thomasville stores (Wayside and Countryside). (*Id*.; Plaintiff's Hearing Ex. 18.)

When Greenwald was further questioned by the Magistrate Judge at the hearing as to whether "the initial year of projected sales was the number [he] arrived at as the appropriate number had not the alleged improper conduct occurred," he clarified that he based his analysis on JGR's actual initial sales figures, plus its business plan. (Tr. at 76.) He isolated "industry functions, demographic functions, buying trends and patterns, the economy of the environment around it." (*Id*. at 80.) After accounting for all these factors, he was left with "two possibilities,

gross mismanagement or an intervening event that caused the damages." (*Id*.) When asked by the Magistrate Judge what impact it would have on the valuation of the business if its downturn was due to "gross mismanagement," Greenwald responded that he was not sure because it would depend on the negotiations. "[I]n the world of fair market value, [...] the typical buyer assumes that they won't repeat mistakes. So they would often look at the projection and say, 'This is what I can accomplish and that is what I am willing to pay.'" (*Id*. at 81.) In other words, a buyer might be willing to pay a higher price because it might conclude that it could do better than JGR had done.

The Court concludes, as does the R&R, that Greenwald has given adequate explanations for why he conducted the analysis as he did. His testimony is, therefore, reliable within the meaning of Fed. R. Evid. 702 and *Daubert*. It is for the jury to decide what weight, if any, to afford his testimony. That said, for the reasons discussed in section B.3 of this Memorandum Opinion and Order, Greenwald will be prohibited from characterizing Thomasville's conduct prior to the breach as "improper" or wrongful in any way.

Defendant's objections with respect to this portion of the R&R are overruled.

**B. Defendant's Motions in Limine and Plaintiff's Motion to Reconsider**

**1. Motion in Limine #1 to Exclude Certain Damages Testimony (Doc. No. 277)**

**a. "Lost Profits" as to Store 2**

In this motion, Defendant first argued that JGR should not be permitted to claim "lost profits" for Store 2 and/or to submit as evidence Greenwald's Schedules I-L. However, Plaintiff has agreed that the issue at trial as to both Store 1 and Store 2 is only "loss of business value." At the *Daubert* hearing, Defendant agreed that Plaintiff's current position on this issue moots this first aspect of Motion in Limine #1.

Accordingly, as recommended by the R&R without any objections from either party, the Court denies as moot that portion of Motion in Limine #1 attacking Plaintiff's lost profits analysis for Store 2.

**b. Obviating Rulings Regarding Stores 3 and 4 by Doubling the Size of Stores 1 and 2.**

Based on "new information" provided by JGR's principal, Gerald Yosowitz, to the effect "that if he had been unable, for any reason, to proceed with Stores #3 and #4 as originally planned, he would have expanded the size of Store #1 and Store #2" (Defendant's Hearing Ex. 2 at 3), Greenwald supplied a supplemental report in October 2011. Defendant seeks to exclude any evidence of Plaintiff's proposed doubling of the size of Stores 1 and 2, arguing that this would be an end-run around this Court's ruling that no Store 3 or Store 4 can be factored into the loss of business value because those stores were too speculative.

The R&R agreed that "it is the law of the case that there will be no evidence relating to a third or fourth store." (R&R at 9.) The basis for this ruling, that Stores 3 and 4 are too speculative, "applies equally to Plaintiff's attempt to seek damages based on a projected expansion of Stores 1 and 2 that would have been contingent on the outcome of the speculative plans for Stores 3 and 4." (*Id*.)

Plaintiff objects to this conclusion. (*See* Doc. No. 310 at 17-21.) JGR argues that this Court's ruling precluding evidence regarding a third and fourth store does not preclude potential expansion of Stores 1 and 2. However, this notion of expansion has *never* been raised before.

Plaintiff's citation to *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 968, n. 20 (5th Cir. 1988) is to no avail. There, the Fifth Circuit stated that it did "not believe that

a going concern, which is the victim of an anti-competitive practice, must forego damages for sales it would have made as the result of the natural expansion of its business simply because it was victimized early in its existence before its attempts to expand could ripen into evidence of preparedness and intent to increase its output." *Id.* at 988. However, in *Heatransfer*, the court determined that plaintiff had "sufficiently demonstrated that it had a business or property interest in a going concern *that had the manufacturing capacity and the market* for units for the entire Volkswagen family of automobiles." *Id*. (emphasis added.) In light of that fact, the court concluded that "the likelihood for growth and expansion of a business such as that of Heatransfer is evident." *Id*. There is no similar evidence in the instant case. Similarly, in *Board of County Comm'rs of Hamilton County v. Flanco Realty Co.*, Nos. C-980781, C-980803, C-980822, 1999 WL 420156, at * 6 (Ohio App. 1 Dist. June 25, 1999), cited by Plaintiff, the court permitted evidence of certain operational changes for purposes of calculating valuation because there was evidence that those changes "could have been readily implemented" and "were in fact planned at the time." As Defendant correctly points out, "through 15 years of litigation, including two trials and three appeals, there has not been a single document, business plan, or piece of testimony claiming JGR would double the size of stores one and two." (Doc. No. 313 at 14.)

Having given the issue *de novo* review, the Court overrules Plaintiff's objection and accepts the R&R's conclusion that this portion of Motion in Limine #1 should be granted.

**c. Greenwald's Discounted Cash Flow Damages are Simply Unrecoverable "Lost Profits"**

Defendant argues in this portion of Motion in Limine #1 that all of Greenwald's "business value" calculations simply discount future "net earnings" of JGR, which is, according

to Defendant, nothing more than a claim for "lost profits" thinly disguised as a discounted cash flow analysis.

The Sixth Circuit has precluded recovery for "lost profits" due to Plaintiff's failure to appeal this issue; however, it remanded for a new trial on the loss of business value. Even though the discounted cash flow method used by Greenwald contains, as part of its calculations, a projection of future earnings, that does not make the testimony inadmissible with regard to Store 1 for purposes of determining the value of the business as a whole. Where an income-producing asset is lost, the fair market value may be based in whole or in part on a buyer's projections of what income the buyer might derive from the asset in the future. *Schonfeld v. Hilliard*. 218 F.3d 164, 176 (2d Cir. 2000). Therefore, as recommended by the R&R, a damages calculation relating to Store 1 which take into account lost future earnings is admissible. Neither party has opposed this conclusion.

The R&R also concludes that, with respect to Store 2, because "lost profits" are precluded, Plaintiff's expert cannot use unearned "projected profits" from Store 1 for "reinvestment" into opening Store 2. Rather, to be consistent with the law of the case, the R&R concludes that, in reaching a business value for Store 2, the actual cost of opening a second store must be utilized in the calculations, not a cost based on an assumed "reinvestment" of unearned "projected profits." (R&R at 10.) Plaintiff objects to this conclusion. (*See* Doc. No. 310 at 22-23.) However, having given the arguments *de novo* review, the Court agrees with the R&R that permitting the expert to opine that certain "projected profits" from Store 1 would have been "reinvested" in Store 2 amounts to allowing "lost opportunity costs," which have previously been rejected by the Court as outside the scope of the remand, and would improperly reinsert an

amount of "lost profits" for Store 1, which a jury determined to be zero and which JGR did not appeal. Plaintiff's objection is overruled.

The Court accepts the R&R's recommendation to grant in part and deny in part this portion of Motion in Limine #1. As to Store 1, Greenwald's testimony will not be limited or excluded. However, as to Store 2, to the extent his testimony is based on "reinvestment" of unearned "projected profits" rather than the actual cost of opening a second store, such testimony is inadmissible.

**d. Profit Rate Used by Greenwald**

The R&R recommends denying Motion in Limine #1 to the extent it seeks to exclude the presentation of evidence which includes calculations using a 3.8% profit rate. Neither party has objected to this conclusion. Accordingly, it is accepted.

**e. Ruling on Motion in Limine #1**

Motion in Limine #1 (Doc. No. 277) is granted in part and denied in part for the reasons set forth above.

**2. Motion in Limine #2 Relating to the 1999 Judgment and Interest Thereupon (Doc. No. 278) and Plaintiff's Motion to Reconsider (Doc. No. 300)**

In Motion in Limine #2, Defendant seeks to preclude Plaintiff from introducing any evidence relating to the 1999 unpaid judgment entered against JGR and the underlying debt of $536,932. The R&R recommends denying Motion in Limine #2 because this issue was previously raised before Magistrate Judge McHargh, who determined that the evidence was relevant, although limited, and is not unfairly prejudicial. Neither party objected to this recommendation. Therefore, the Court accepts the recommendation and Motion in Limine #2 (Doc. No. 278) is denied. That said, the Court can perceive no reason why the "underlying

liability"would need to be introduced to the jury except, possibly, as part of an expert's valuation of the business. However, since business value is judged with respect to the date of the breach (*i.e.*, November 15, 1992), there is *no* reason to ever mention the "1999 Judgment," which did not exist as of the date of the breach. The Court intends to be very vigilant with respect to this distinction.

In its Motion for Reconsideration, Plaintiff requests reconsideration of this Court's November 11, 2011 ruling that it may not seek as consequential damages for Thomasville's breach of contract an amount equal to the pre- and post-judgment interest on the 1999 Judgment.[8] The R&R concludes that this motion should be denied because allowing such consequential damages would amount to an impermissible collateral attack on the 1999 Judgment and/or is barred by the principles of *res judicata*. Plaintiff objects to these conclusions, raising several arguments. (*See* Doc. No. 310 at 6-17.)

Plaintiff first argues that the law of collateral attack has no appliction to this case because none of the elements of a collateral attack set forth in *Ohio Pyro, Inc. v. Ohio Department of Commerce*, 115 Ohio St.3d 375 (2007) is found here. Plaintiff argues that it is not challenging the validity or effectiveness of the Thomasville Judgment nor is it trying to set it aside in any way. Relying on *Thayer v. Diver*, No. L-07-1415, 2009 WL 1167888 (Ohio App. 6 Dist. May 1, 2009), Plaintiff asserts that the most it is trying to do is to deny Defendant some of the "fruits" of the Judgment.[9] However, as properly pointed out by the R&R, *Thayer* was not a

[8] Plaintiff's fundamental argument is that, had Defendant not breached the contract, JGR would have remained in business and would have been able to pay the amount it owed Thomasville, without there being an actual judgment with pre-judgment interest and accruing post-judgment interest. Plaintiff wants to be able to recover as an element of its consequential damages the amount of interest it owes on the Thomasville Judgment.

[9] In *Thayer*, the two parties were former principals in a defunct engineering firm, AVCA Corporation. Thayer had executed a continuing guarantee in which he unconditionally guaranteed debts owed by AVCA to Key Bank. Subsequently, Thayer and Diver executed an Employee Termination Agreement under which Thayer agreed to

collateral attack on a receiveship judgment because it involved a claim for damages against a third party not the party to the earlier receivership proceeding. In the instant case, JGR and Thomasville are both parties to the Thomasville Judgment.

Plaintiff next argues that the Magistrate Judge's recommendation lacks any supporting legal authorities and that "Thomasville has been unable to cite a single case[10] that has given 'collateral attack' the broad interpretation that the Magistrate Judge has now announced, i.e., as extending to any action which seeks to deny to a holder of a judgment some of the 'fruits' of that judgment (such as post-judgment interest), even though no attempt has been made to attack the integrity or validity of that judgment." (Doc. No. 310 at 10.) Plaintiff's "fruits of the judgment" argument arises from its reliance on *Thayer*, which this Court has already rejected.

Plaintiff next argues that the Magistrate Judge's broad statement with respect to "undermining" and "defeating" a judgment is not supported by Ohio law, in particular, by the

---

terminate his employment with AVCA, resign all of his officer and board positions, and deliver to AVCA his shares of company stock. He was to be paid a total of $1,191,250 for his stock, secured by two promissory notes, and, in exchange for signing a non-compete agreement, he would receive an additional $850,000 to be paid in 60 monthly installments. AVCA's obligations to Thayer totaled $2,041,250, plus interest, to be made in monthly payments over a period of five years. After nine months of timely payments, AVCA reduced and eventually eliminated payments to Thayer. Over the next several years, a series of communications occurred between Thayer, Diver and Key Bank wherein Thayer sought to retrieve his stock, help the AVCA out of its financial troubles, and obtain a release from his guarantee. He was unsuccessful. AVCA eventually went into receivership and it was sold to SSOE, another engineering firm. Thayer then sued Diver and Key Bank alleging various causes of action and seeking, *inter alia*, to be released from his guarantee of the outstanding balance of Key Bank's loan to AVCA, which totaled over $3 million. Key Bank counterclaimed to recover on the guarantee. The trial court at first denied motions for summary judgment but, on reconsideration sought by Diver and Key Bank, concluded that Thayer's claims were barred by *res judicata* and that the guaranty was enforceable against Thayer. Thayer appealed on many issues, including the *res judicata* bar. Diver argued in opposition, *inter alia*, that Thayer's lawsuit amounted to a collateral attack on the judgment in the receivership because, if Thayer prevailed, it would result in Thayer's recovery of proceeds from the sale of AVCA to SSOE. The court of appeals rejected this argument because Thayer was seeking damages not against AVCA but against Diver for certain improper conduct that began years before the receivership. It stated: "While a judgment in Thayer's favor might have an incidental effect on Diver's ability to retain the fruits of that sale, it cannot possibly be construed as a collateral attack on the integrity of the judgment in the receivership case." 2009 WL 1167888, at * 9.

[10] Plaintiff attacks the three cases cited by Thomasville (*In re Met-L-Wood Corp. v. Pipin*, 861 F.2d 1012 (7th Cir. 1988); *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506 (7th Cir. 1996); *Horovitz ex rel. Ohio Colprovia Co. v. Shafer*, 94 N.E.2d 201 (Ohio App. 2 Dist. 1950)) as bearing no relationship to the facts of the instant case. The Court agrees that these are not the best citations; however, Thomasville has supplied better legal citations in Doc. No. 313.

Ohio case law cited by the R&R. Once again Plaintiff points to *Thayer*, *supra*, as authoritiy for the proposition that it should be allowed to pursue for itself the "fruits" of Thomasville's Judgment. The Court has rejected that argument, finding *Thayer* distinguishable from the instant case.

Plaintiff next argues that *res judicata* does not apply in this case because that doctrine bars only a "subsequent action on the same claim or cause of action between parties[.]" *ABS Indus., Inc. v. Fifth Third Bank*, 333 Fed. App'x 994, 998 (6th Cir. 2009) (citing *Brown v. City of Dayton*, 89 Ohio St.3d 245 (2000)). Plaintiff argues that its claim to recover post-judgment interest related to the Thomasville Judgment could not possibly have been raised prior to the entry of that judgment. However, the Thomasville Judgment was a stipulated judgment. If Plaintiff knew at the time, as it argues below, that it had no ability to pay the judgment at the time it was entered, it certainly would also have known that post-judgment interest would begin to run. If it also believed that it should be able to recover any such interest as a form of its own consequential damages, then it should have included words to that effect in the stipulated judgment, thereby possibly preserving its right to pursue that course of action. Better yet, it should have refused to stipulate to the judgment if it believed that Thomasville was not entitled to collect its post-judgment interest. This argument is rejected.

Finally, Plaintiff argues that JGR had no assets in 1999 with which to pay the Thomasville Judgment. Plaintiff makes this assertion in opposition to this Court's mention that, had it paid the judgment promptly after its issuance, JGR would not be in a position of owing so much interest. The Court has no idea why this argument is even made; clearly, a judgment is a judgment and the fact that JGR had no assets from which to pay the judgment does not mean that

it should now be permitted to collaterally attack, and recover on some sort of restitution theory, the post-judgment interest that has been running on the judgment. This argument is rejected.

Plaintiff also raises in its objections what it calls a "relevant analogy," a hypothetical scenario allegedly analogous to the current situation:

> Because of a breach of contract committed by defendant Bank, assume that plaintiff Smith was unable to make the mortgage payments on the family home (which had been in the Smith family for generations). Defendant Bank therefore took judgment on the mortgage note and foreclosed on the property. At the ensuing sheriff's sale, the home was sold to a third party. Plaintiff Smith then sues defendant Bank (for breach of contract) and asserts, as one element of his damages, the loss of his family home. As a defense to that portion of plaintiff's claim, defendant Bank asserts that Smith is engaging in an impermissible collateral attack on the judgment that defendant Bank took against him, since Smith is arguing that, had the Bank not taken that judgment, Smith would not have lost the family home.
>
> Would that "collateral attack" argument have any merit? JGR submits that it would not. Is there any other reason why plaintiff Smith should not be able to proceed with his claim against defendant Bank? JGR submits that the answer to that question is also "no."

(Doc. No. 310 at 14-15.) Unfortunately for Plaintiff, this situation is not particularly "hypothetical." In fact, Defendant has pointed to case law in which the scenario is exactly as Plaintiff argues above and where the courts have determined that this would be an impermissible collateral attack. *See A.B.C.G. Enterprises, Inc. v. First Bank Southeast, N.A.*, 515 N.W.2d 904 (Wisc. 1994);[11] *Del Turco v. Peoples Home Savings Assoc.*, 478 A.2d 456 (Pa. 1984).[12]

---

[11] First Bank, as mortgagee, sued ABCG seeking foreclosure of ABCG's interest in various properties pursuant to certain mortgage assumption agreements. ABCG did not defend and default judgments of foreclosure were entered against it in favor of First Bank. ABCG then sued First Bank for damages alleging that First Bank's own actions in breach of contract caused ABCG to default on the mortgage agreements and, by way of foreclosure, lose its interest in the properties. Wisconsin has no compulsory counterclaim requirement and ABCG relied on that fact to argue that it was not barred by *res judicata* from bringing its breach of contract claim against First Bank. However, the Wisconsin Supreme Court, in reliance on Restatement (Second) of Judgments, § 22, Comment f, pointed to special circumstances under which failure to interpose a counterclaim operates as a bar. Specifically, that comment noted that a counterclaim must be brought in the original action if its successful prosecution in a subsequent action "would nullify the judgment, for example, by allowing the defendant to enjoin enforcement of the judgment, or *to recover on a restitution theory the amount paid pursuant to the judgment*." 515 N.W.2d at 908 (emphasis added).

Having considered *de novo* Plaintiff's objections, the Court is convinced that the R&R is correct that allowing Plaintiff to attempt to recover dollar-for-dollar the amounts of pre- and/or post-judgment interest it owes on the $536,932 Thomasville Judgment would amount to an impermissible collateral attack on that judgment. Accordingly, Plaintiff's objections are overruled and the R&R is accepted with respect to this issue.

**3. Motion in Limine #3 Relating to "Pre-Breach Conduct" (Doc. No. 279)**

In Motion in Limine #3, Defendant seeks an order (1) prohibiting Plaintiff from offering testimony about alleged pre-breach conduct or interference by Thomasville or any reference to that conduct as "wrongful" or inappropriate; and (2) prohibiting Plaintiff from recovering any damages on that alleged pre-breach conduct and, in particular, prohibiting Plaintiff's expert from using an altered balance sheet to inflate the value of Store 1 based on the alleged pre-breach interference.

The R&R recommends granting the motion in part and denying it in part. The R&R states that "Plaintiff should be permitted to offered limited testimony regarding Thomasville's conduct prior to November 15, 1992 to establish a foundation for its expert's report and in defense of any argument by Defendant that the value of JGR was zero. However, Plaintiff should be precluded from offering testimony in this regard that includes the use of terms such as 'improper,' 'wrong,' 'misleading,' 'illegal,' 'interference,' or other similar terms." (R&R at 20.) Further, "if Plaintiff's expert's report is to be admitted into evidence, any references to

---

[12] Peoples Home instituted a foreclosure action against the Del Turcos because they defaulted on a mortgage note. The Del Turcos failed to answer and a default judgment of foreclosure was entered. The subject real estate was sold at a sheriff's auction. The Del Turcos then sued Peoples Home for trespass and assumpsit, essentially "present[ing] a restitutionary theory of recovery that, in essence, challenges the amount of debt paid Peoples Home pursuant to judgment in the mortgage foreclosure action." 478 A.2d at 463. Citing the Restatement (Second) of Judgments, § 22, the Superior Court of Pennsylvania concluded that the litigation, if successful, "would operate to undermine the initial judgment of Peoples Home." *Id*. Therefore, the court applied the doctrine of *res judicata* to bar the action.

such terms that are contained in Plaintiff's expert report should be stricken and replaced with more neutral text." (*Id*.) Finally, "the Court should caution Plaintiff and its counsel against offering testimony or argument regarding Thomasville's conduct prior to November 15, 1992 for any reasons other than as provided herein." (*Id*.) Neither party specifically opposed any of these three recommendations and, therefore, the Court accepts them.

Defendant, however, objects to the R&R's specific failure to consider its challenge to Plaintiff's expert's use of a fabricated balance sheet "based on *pro forma* assets and liabilities of a national average store and not based on JGR's actual assets and liabilities" for purposes of establishing a baseline value for Store 1. Defendant asks this Court to clarify that Greenwald's market approach estimates based on this balance sheet are inadmissible in any way, including as additional support for his income approach estimates. (Doc. No. 311 at 11.)

To the extent this issue has already been discussed in the *Daubert* section of this opinion, it need not be addressed in this section. While Greenwald has testified that, in his opinion, the loss of business value will be determined based not on the market approach but on the discounted cash flow approach, this does not mean that Greenwald will not be permitted to testify how and why he chose that approach over the other acceptable approaches (provided, of course, that the expert does not violate the Court's directives regarding his characterization of Thomasville's pre-breach conduct). The Court also explicitly notes that Defendant is certainly free at trial to vigorously challenge Plaintiff's expert's testimony and report in this regard. In fact, Defendant's objections make clear that its own expert, Richard Schmitt, will "ma[k]e his lost business valuation assuming that JGR's past performance is *not* indicative of its future performance, and will instead project future performance based on other furniture stores in northeast Ohio, as JGR's expert has done." (Doc. No. 311 at 12, footnote omitted; emphasis in

original.) "To be clear, Thomasville's expert will rely on JGR's actual assets and liabilities as of the date of the breach in his valuation because the discounted cash flow methodology require[s] that he so so." (*Id*.) Although the Court has determined that Plaintiff's expert's application of the discounted cash flow methodology (using industry norms, as opposed to actual figures) is reliable, in view of Defendant's expert's method of using *actual* assets and liabilities, it will be up to the jury to determine whose his valuation of Store 1, if any, should be given weight.

The R&R also recommends that the Court "encourage the parties to reach a stipulated statement of facts regarding the parties' conduct before the date of the breach, November 15, 1992, and/or should provide a limiting instruction to the jury on this point." (R&R at 20.) Neither party has objected to either recommendation. However, Defendant has stated its willingness "to stipulate that JGR's past profitability (or lack thereof) is not indicative of future profitability and that a willing buyer may choose to assume that JGR's profits in the future would be similar to other retailers in northeast Ohio." (Doc. No. 311 at 12.) This, Defendant argues, should "remove any need for JGR to present testimony regarding pre-breach interference as a basis for Greenwald's testimony as Thomasville is stipulating to the basis." (*Id*. at 12-13.)

Plaintiff has responded to Defendant's offer to stipulate by asserting that it is in direct contravention of this Court's Order of November 11, 2011, wherein the Court stated that there were too many fact disputes to award summary judgment to either party and that "[a]ny factual evidence that has been submitted to earlier juries must be resubmitted to a new jury."[13] (Doc. No. 298 at 15.) This is taken somewhat out of context; of course, facts to make a claim for damages will need to be presented to the jury. However, that does not preclude the parties

[13] The Court trusts that counsel understood this statement to mean any relevant and admissible evidence to the issues in the case as the case now stands, and in accordance with the Court's present rulings on the case.

entering into fact stipulations. In fact, the Court fully expected that the parties would do so because there are *many* facts that are not *honestly* in dispute. Such stipulations were due by December 5, 2011, but none were filed.[14] Plaintiff asserts that no factual stipulations should be made because "[o]nly through the oral testimony from the people who were actually there in 1991 and 1992 will the jury be fully able to understand (i) what happened to this business in 1991 and 1992, (ii) how Thomasville's conduct in 1992 constituted a breach of contract, (iii) why that contract was so critical to JGR, and (iv) how Thomasville's breach of that contract impacted JGR's business." (Doc. No. 312 at 12.)

Of course, the Court cannot force anyone to stipulate to facts, even those it knows are not is dispute. That said, this Court will very carefully monitor the testimony that is permitted. There will be no re-litigation of the already-established breach of contract; there will be no suggestion that Defendant is somehow liable in tort for its "wrongful" pre-breach conduct. Rather, any testimony about "pre-breach conduct" will be limited and admitted solely for purposes of contextualizing Plaintiff's expert's report and valuation conclusions. The jury will be instructed as to the purposes for which such testimony may be considered.

For the reasons set forth above, Motion in Limine #3 (Doc. No. 279) is granted in part and denied in part.

**IT IS SO ORDERED**.

Dated: December 15, 2011

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

[14] On December 12, 2011, Defendant alone filed a Proposed Stipulation of Facts and Request for Judicial Notice, seeking to eliminate any need for Plaintiff to offer testimony about pre-breach interference. (*See* Doc. No. 319.) By Order dated December 13, 2011, the Court directed Plaintiff to address this proposed stipulation paragraph by paragraph, indicating what, if anything, is objectionable to Plaintiff.